Auerbach *v.* Philadelphia Transportation
Company, Appellant.

Argued May 4, 1966. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Harry A. Takiff,* with him *Takiff & Bolger,* for appellant.

*B. Nathaniel Richter,* with him *Kenneth Syken, John J. McCarty,* and *Richter, Lord & Cavanaugh,* for appellee.

· Opinion by Mr. Justice Musmanno, June 24, 1966:

Mrs. Frances B. Auerbach, 53 years of age, was gravely injured and permanently crippled on August 30, 1962, when a bus of the defendant Philadelphia Transportation Company passed over her body, resulting in an amputation of her right leg. She brought suit against the traction company, the jury returning a verdict in the sum of $237,500. The defendant seeks a new trial, alleging trial errors.

Mrs. Auerbach testified that while she was walking southwardly on 18th Street, headed for her home, and had reached a point about one foot away from the north curb line of Walnut Street and while still on the sidewalk, a bus of the defendant company climbed the curb and brushed against her. She attempted to step back, but as she was doing this, the driver directed the forward part of his huge vehicle toward his left, causing the rear part of the bus to mount the sidewalk, striking her and knocking her to the ground. She was dragged into the street and the bus, passing over her, inflicted horrible and mangling mutilations, unnecessary, fortunately, to describe here.

If the accident happened in this manner, the negligence of the defendant company, through its driver, was established absolutely. A pedestrian on a sidewalk is entitled to sanctuary from vehicles on the street as surely as one praying on his knees in a cathedral.

The defendant company disputed that the accident happened in the manner described by the plaintiff. The bus driver testified that as he was about to cross 18th Street, having proceeded normally in a westward direction on Walnut Street, the plaintiff stepped out into Walnut Street and then drew back. The driver could not say just how his vehicle finally came into contact with the body of the plaintiff. In view of the fact that the defendant now urges that the lady who

stepped in front of the bus might not have been the plaintiff, as will be noted later, it may be in order to quote the driver's testimony in this regard: "Well, as I was proceeding across and got alongside the first newsstand, a woman stepped off the pavement, off the curb, into the street. I hit my brakes and she stepped back or jumped back, I can't recall. I eased my foot pressure off the brake and coasted across 18th Street. I heard someone holler. I stopped my bus. I got my money to go out, and I started walking back towards the intersection. As I got back to the curb, the west side curb of 18th and Walnut Street, I saw this lady sitting up in the street and there was a lady leaning over her with a white uniform on, a young lady, and there was a man also kneeling over her. The lady was hollering."

The driver admitted that after passing the woman he exclaimed "My God," slammed on his brakes and looked into the rear mirror: "Q. Why did you look in your right rear mirror? A. I wanted to make sure that the lady that I saw jump back up off—out of the street was O.K. . . . Q. You looked in your rear mirror because you thought maybe you hit her, is that it? A. I wanted to re-assure myself, sir. Q. As to whether you had hit her, is that right? A. Yes, sir."

When questioned by the Accident Investigation Police, the driver said: "I thought it was a close one."

The case was ably tried by both counsel, advocates of considerable experience, the trial judge presided with competence, patience, forbearance and firmness, and the jury returned a verdict which, from all appearances, was a just and proper one, entirely supported by the evidence. A new trial, with all its attendant anxieties, time, and expense involved should be avoided unless, of course, there were such errors in the first trial as makes a retrial imperative under trial rules now well established in Pennsylvania jurisprudence.

Defendant's counsel avers that there were such errors and has filed a formidable brief in support of his contentions.

We will consider them seriatim.

The defendant asserts that the trial court submitted to the jury alternative and conflicting theories as to the happening of the accident, neither alleged nor proved. We have seen that there were two main conflicting accounts as to how the accident happened, the plaintiff maintaining that the bus usurped the sidewalk occupied by the plaintiff, the defendant asserting that the plaintiff entered into the street occupied by the bus. The defendant, however, did not limit its defense to the lady-in-the-street assertion. It advanced additional various theories as to how the distressing circumstances reached tragic climax. Among them is the proposition that the lady ran into the bus, that possibly she had an epileptic seizure and fell under the bus, that the bus hewed to a straight line on Walnut Street and therefore the doleful event could not have developed as narrated by the plaintiff. The defendant not only advanced these arguments in academic refutation of the plaintiff's case, but produced evidence in support of these propositions.

In these circumstances, the trial judge was compelled to instruct the jury on the varying factual assertions. Indeed, it would have committed error had it not lifted a lantern of enlightenment in the area where the defendant cast so many shadows discrediting to the plaintiff's case. For instance, the defendant claims that it was error for the court to charge on certain provisions of The Vehicle Code. It asserts that since the plaintiff stated she was on the sidewalk and did not descend into the street, there was no need for the court to charge on the matter of traffic lights. But the defendant claimed that the plaintiff stepped off the curb into the street when the traffic light was red

against her and green for the bus. The court could not avoid charging on responsibilities weighing on motorists and pedestrians where traffic lights are involved in the litigation. Then the defendant complains because the court said that proceeding ahead (for motorist or pedestrian) in the face of a non-green light, constituted negligence, urging that such a violation could not be regarded as negligence unless it was the proximate cause of the accident. But the court charged very clearly on proximate cause: "Furthermore, even if you determine that the defendant was negligent and the plaintiff was not contributorily negligent, you must then determine whether the defendant's negligence was the proximate cause of the plaintiff's injuries and damage. By proximate cause we mean that which, in a natural and continuous sequence unbroken by any intervening cause, produces the injury, and without which the result would not have occurred."

The defendant urges the strange proposition that the lady who stepped into the path of the bus may not have been the lady whom the driver saw in the street after the collision. Of course, this does fall within the realm of possibilities but since the bus driver, in his main testimony, specifically made the two ladies one and the same person, even though he may have altered that view later (although not necessarily so), the court was compelled to give the jury instruction on applicable provisions of The Vehicle Code, appertaining to vehicles and pedestrians on the highway.

Throughout the entire sweep of the defendant's argument runs the constant current of criticism that the trial court confused the jury by charging on matters not alleged or proved. It levels attack on the court's affirmance of the plaintiff's Point No. 9: "I charge you that under the evidence if you find that defendant's bus swerved and either mounted the sidewalk or came so close to the sidewalk as to strike plain-

tiff and her injuries resulted thereby, then if you so find you may find such conduct on the part of the bus driver to be negligence and you may further find that it was negligence not foreseeable by the plaintiff, located as she was and that this negligence rendered unsafe the bus that was otherwise safe and lawful for the plaintiff, that then the plaintiff would not be guilty of contributory negligence."

The defendant maintains the court here introduced a new and unpleaded theory of liability because the plaintiff's whole case was predicated on the proposition that the bus invaded the sidewalk. Standing alone, this is a plausible argument, but considered in connection with all of the testimony in the case it loses conviction. The plaintiff testified that as the bus approached 18th Street "I heard the wheels scraping and squealing along the curb." Since the plaintiff was only one foot away from the curb, it would not take much of an overhang or swerving to draw her into the fatal orbit of the lumbering 40-foot-long gargantuan vehicle.

It will be recalled that the defendant's driver admitted he had told the policeman that the accident was "a close one." He admitted also that he did not use the white guidelines on Walnut Street or the curblines for estimating the closeness of his right side to the curb on Walnut Street. Two witnesses for the defendant, who testified that the bus had proceeded in a straight line, stated on cross-examination that they heard a thud in the vicinity of the right rear wheel and that the thud was substantial. One of the passengers testified that the bus came close to the curb and that the driver increased his speed as he approached the spot occupied by the plaintiff. It is not enough for an automobile, truck, bus, or any other vehicle to stay within the space allotted to it in the highway. It must not drive so close to the sidewalk that any projection from it invades the refuge of pedestrians.

The defendant complains because the court refused to affirm its Point 12: "If you find that the bus was traveling at all times in the street and not on the sidewalk your verdict must be for the defendant." The affirmance of this point would have been error because it would exclude from liability any passenger bus with an overhang wide enough to hit lamp posts as it moves by. In *Ross v. Riffle,* 310 Pa. 176, the defendant motorist testified, without contradiction, that he did not drive over the curb. Nevertheless, the evidence demonstrated that the plaintiff, who had been standing on the sidewalk, had been injured by the defendant's car. In affirming judgment for the plaintiff, this Court said: "If the plaintiff was struck by defendant's car while standing on the sidewalk, it must be that he was struck by the overhang of the fender. Of course this was possible, if the car was driven to and swerved away from the curb just before it would have crossed the curb at the place where he was standing."

In support of his claim that the lady who stepped into the street may not have been Mrs. Auerbach, defendant's counsel quotes from his opening address to the jury. Interesting as it is, we cannot accept an opening address as determinative of any issue involved in a lawsuit. Even so, that portion of the defendant's counsel's address to which he invites attention, does not negate what the defendant's driver says, but asserts that two of the passengers on the bus would testify that "this bus was proceeding in a proper, orderly, regular manner, at a regular pace, with no reason for hurrying, no reason to move other than in its regular fashion." How would the passengers know that the bus driver had no reason for hurrying and he had no reason to move other than in its regular fashion? And what evidence was there as to what the regular fashion was?

The defendant introduced evidence to the effect that some time prior to the accident, the plaintiff had been treated for a condition akin to epilepsy. From this medical history the defendant advanced the theory, without a word of evidence to substantiate it, that the plaintiff at the time the bus came into view at 18th Street and Walnut, suffered a seizure that caused her to fall against the bus and under the wheels.

The fact that a person may be subject to epileptic seizures cannot be used as an explanation for an untoward event when the evidence not only excludes that he had a seizure at the time but in fact demonstrates that a wholly extraneous occurrence caused the untoward event. History tells us that Julius Ceasar was an epileptic, but no one has argued that the evil which befell him on the Ides of March was due to his falling, as the result of an epileptic seizure, on Brutus's sword which just happened to be in his immediate vicinity.

Moreover, the specific affliction attributed to the plaintiff is termed "syncopal episodes" defined as psychomotor seizures which cause the patient to lose contact with his surroundings and stare into space. Thus, even if Mrs. Auerbach had stared into space as the bus approached her, this would not have precipitated her into violent contact with the defendant's vehicle. What the defendant wished the court to do, and which the court properly refused to do, was to charge the jury that it could assume that the plaintiff had had a seizure and that as a result of this seizure she had fallen under the wheels of the bus. This of course would be to build a presumption on a presumption, which would build a smoke ladder into the skies of irresponsible speculation, which, fortunately, the law prohibits. (*Neely v. The Provident Life and Accident Insurance Company*, 322 Pa. 417, 426.)

A trial court should not instruct the jury on law applicable to no facts in the case. In *O'Toole v. Brad-*

*dock Borough*, 397 Pa. 562, quoted with approval in *O'Neill v. Reading Co.*, 306 F. 2d 204 we said: "A trial judge must not conjure up imaginative situations which reflect adversely on either party, because there is always the possibility that the jury may take the judicially invented hypothesis as a factual foundation upon which to build a verdict which will then rest on airy fantasy rather than on evidence."

During the bus driver's cross-examination, plaintiff's counsel asked him if he had not told the police after the accident that he had looked into the rear mirror of his bus and remarked that "it was a close one." Defendant's counsel objected to this question, stating that the bus driver was not a party defendant and therefore whatever statement he made could not be binding on his employer which had not authorized him to make any such statement. The court overruled the objection and the defendant urges this ruling as prejudicial error, which demands a new trial. Defendant's counsel mistakes the purpose of the cross-examination cited and the court's ruling. The objected-to question was not put to elicit a statement binding the defendant on the subject of liability. Its obvious purpose was to impeach the credibility of the witness which is permissible in any cross-examination.

The defendant states further that the question was improper because the policeman who made the report had not testified or identified the report. Since the witness did not deny having made the statement attributed to him, there was certainly no necessity of presenting the police report. When the driver took the witness stand to testify, he entered on the highway of cross-examination where he could be stopped at any point to be questioned as to whether he carried with him the indicia of credibility, reliability, accuracy of recollection and truth of statement. To deny the ques-

tioning here quoted would be to wreck the whole system of adversary court proceedings.

The plaintiff testified that on October 22, 1963, some 14 months after her leg had been amputated, she lost balance, fell and sustained a fracture of her hip. Dr. Leonard Klinghoffer, who had performed the amputation, was asked: "Doctor, what was the effect of the losing of the limb and the other problems in that one leg and the weeping in the other leg so far as her sense of balance and stability is concerned so that it might affect her falling as she did do later on when she broke her hip?"

The doctor replied: "Well, had she not had an amputation on one side, I feel quite certain she would not have fallen."

Defendant's counsel objected to this testimony and now assigns the overruling of his objection as trial error, stating that the doctor was thus permitted to state a conclusion on a matter which was exclusively within the province of the jury. It was not disputed that the plaintiff had sustained the fall to which she testified. The only question for consideration was whether the fall was due to her condition, which was the direct result of the bus accident. This was surely a medical question and called for expert testimony. "Expert testimony is admissible in all cases, civil and criminal alike, when it involves explanations and inferences not within the range of ordinary training, knowledge, intelligence and experience." (*Com. v. Nasuti*, 385 Pa. 436, 443.)

Dr. Klinghoffer was eminently qualified to offer his opinion on the question put to him because, not only was he a physician conversant with cause and effect in situations of this character, but he was also the plaintiff's own physician and surgeon and, therefore, knew her physical condition and capacity to absorb pain and muster strength. In *Florig v. Sears, Roebuck & Co.,*

388 Pa. 419, Chief Justice BELL said: "If plaintiff wished to recover for injuries resulting from the second accident it was incumbent upon him—under the facts of this case—to prove by competent and definite medical testimony that there was a causal relationship between the two accidents."

Of course, there can be situations and some have been adjudicated by this Court where medical testimony is not required (*Tabuteau v. London G. & A. Co., Ltd.,* 351 Pa. 183), but in the circumstances here outlined, the medical testimony adduced was not only proper, but highly desirable in the ascertainment of the facts. The defendant urges that Dr. Klinghoffer's testimony constituted hearsay. His testimony was not hearsay. The circumstances of the fall were related by the person who experienced it, Mrs. Auerbach herself. The doctor's testimony was limited to his knowledge of Mrs. Auerbach's condition prior to the fall as known to him directly and his expert opinion on causation. This was proper. *Boyle v. Phila. Rapid Transit Co.,* 286 Pa. 536.

The defendant states that the court improperly referred to evidence supporting its version of the accident as circumstantial, whereas the plaintiff's version was called direct evidence. If the court had indeed characterized all of defendant's evidence as circumstantial, it would have committed reversible error, but it did not: "The defendant, however, relies upon circumstantial evidence, *in part,* and asks you to draw the inferences arising therefrom, that the accident did not happen that way." (Emphasis supplied.)

There can be no doubt that much of the defendant's case was based on circumstantial evidence, but the court did not downgrade that type of evidence. Nor did the defendant regard the court's charge in this respect as prejudicial since it took no exception to it.

Finally, the defendant complains that the court erred in not having withdrawn a juror because of "prejudicial comments, prejudicial behavior by plaintiff and improper arguments to the jury." The defendant states that plaintiff's counsel dwelt "on the gruesomeness and horror" of the injuries suffered by the plaintiff. For counsel not to have addressed himself to the physical realities of the appalling injuries evident in this case would be like asking a surgeon not to render his services, skill and care because the injured body before him was too horribly mangled. After the bus had driven its huge wheels, supporting the juggernaut weight of its giant superstructure over the plaintiff's limbs, the condition of her mutilated body was such that the driver, after looking at her lying on the street, apparently bleeding to death, fainted. Had it not been for the providential arrival of a fireman, who had been following the bus in a fire truck, and who applied a tourniquet and rendered first aid, the plaintiff would probably have died before she could be gotten to a hospital.

A lawyer has not done his duty in presenting his case to the jury if, because of a faint heart and sensitive nerves, he does not acquaint the fact-finders with the exact nature of his client's tragic misfortune. A courtroom is no less a laboratory for the ascertainment of truth than the light-flooded operating room wherein surgeons cut away disease and irreparable tissue in order to reconstruct and rehabilitate the soundness and health, to the extent that science can make it possible, of the limp helpless victim of malady or violence.

The defendant states that plaintiff's counsel engaged in an "emotional appeal." The emotions are as much a part of man's normal functions as the strength of his muscles, the vision of his eyes, the feel of his fingers and the audibility of his ears. The untenability of the defendant's complaint in this respect is evi-

denced by its complaint that plaintiff's counsel during his summation speech "demanded that they deliver a 'full verdict.'" It would be strange indeed if he had asked for a half verdict or a quarter verdict.

Just as defendant's counsel, undoubtedly from a sincere conviction that this constituted justice, urged the jury to give the plaintiff a zero verdict, plaintiff's counsel had the right, to say nothing of his duty, if he was to be faithful to his client's interests, to ask for a full verdict.

The defendant complains because the plaintiff testified from a wheel chair, and that her "general appearance and demeanor" were "abject and woeful." A 53 year old widow, dependent for her living upon a modest salary she received as a comptometer operator, who had had her leg practically sawed away from her body by the wheels of a truck, the slight tendon holding the limb to her body later having been sawed away in the hospital so close to her torso that she could not maintain balance, would certainly be "abject and woeful" in a courtroom, worrying as to whether her future was to be as black as it must have seemed to her as she lay in the dirt of the street under the forbidding mechanism of the ruthless engine above her.

The defendant complains because the plaintiff "without any forewarning, broke into audible sobs and tears and had to be wheeled out of the courtroom". Neither history nor fiction records any incident of a grief-stricken person announcing to the world, before spontaneous tears well into his eyes, "Be informed, I am about to cry." Moreover, defendant's brief seems to have exaggerated the lachrymatory incident it describes. The plaintiff was not in the immediate vicinity of the jury when she shed a tear because of some particularly poignant testimony coming from the witness stand. The trial court placed on the record what occurred: "The Court wishes to correct the record, Mr.

Takiff. The cries were not in a loud voice but in a manner quite usual with females. The woman was immediately removed from the room and the court officers closed the door, so that the effect upon the jury could not have been of such a type as could be prejudicial, and therefore your motion is denied."

To prohibit tears in a courtroom, where so many of life's tragedies are recounted, is like prohibiting the Mississippi of life's sorrows from flowing into the seas of heartbreaking grief and fearful foreboding.

Then the defendant lodges the novel complaint that plaintiff's counsel was too able an advocate, stating he was "a man of 35 years of trial experience, undeniably skilled and learned in the rules of evidence and so barred from the defenses of innocent mistake or inadvertence."

To restrict the utilization of a lawyer's forensic equipment because of his unusual abilities would indeed be a bizarre development in the law. Such curtailment of capacity would have prevented Clarence Darrow, Joseph H. Choate, Francis M. Wellman, Robert G. Ingersoll and other masters of the bar from electrifying, charming, moving and convicing juries to the best of their abilities and talents in the discharge of their appointed tasks to represent their clients with full faith and devotion.

And as a postscript to the enumeration of disapprovals advanced by the defendant, it is urged that plaintiff's counsel abused the law because he "offered the Bible to establish a life table of 'three score and ten years'." The defendant has presented no precedent to bar quotations from the Bible in any phase of legitimate argumentation in court.

And then, as a concluding point, the defendant states that, despite the plaintiff's own account as to what happened to her, despite the physical marks in the street showing that the plaintiff's body had been

dragged from the safety of the sidewalk to the hazards and the perils of the vehicle-pounded highway, and despite other confirming evidence (physical and personal) of the plaintiff's recital, the accident could not have happened that way, but that: "The only logical explanation for the happening of the accident which was consistent with plaintiff's prior history and with all of defendant's testimony was that the plaintiff suffered a psychomotor seizure and fell into the side of the passing bus."

This, of course, is to ignore fact for fancy, positive evidence for guesswork, and demonstrated proof for dialectic legerdemain. The jury and the court below rejected this line of disputation and it finds no more concurring approval here.

Judgment affirmed.

Mr. Justice JONES and Mr. Justice COHEN dissent.