595 A.2d 62

Charles OBLON and Bonnie Oblon, H/W, Appellants,

v.

The LUDLOW–FOURTH CORP., Westinghouse Electric Corporation, Bressman & Carol, Philadelphia Electric Company B–K Electrical (ASCO), Shaffer–Gordon Winmon, Inc. and Keystone Engineering Corporation. (Two Cases)

Charles OBLON and Bonnie Oblon

v.

The LUDLOW–FOURTH CORP., Westinghouse Electric Corp., Philadelphia Electric Co., Bressman & Carol, Ind. and t/a Richard Roe; Keystone Engineering Corp.; Shaffer–Gordon Associates and B–K/ASCO.

Charles OBLON and Bonnie Oblon, H/W

v.

The LUDLOW–FOURTH CORP., Westinghouse Electric Corp., Philadelphia Electric Co., Bressman & Carol, Ind. and t/a Richard Roe; Keystone Engineering Corp.; B–K/ASCO.

Appeal of KEYSTONE ENGINEERING CORP. (Two Cases)

Superior Court of Pennsylvania.

Argued March 21, 1991.

Filed June 19, 1991.

Rearguments Denied Sept. 3, 1991.

Stephen Saltz, Philadelphia, for Oblon, appellants (at 1112 and 1113) and appellees (at 1248 and 1114).

Gordon Gelfond, Philadelphia, for Bressman & Carol, appellee (at 1112, 1113, 1114 and 1248).

James M. Marsh, Philadelphia, for Keystone Engineering, appellant (at 1248 and 1114) and appellee (at 1112 and 1113).

Robert A. Koons, Jr., Philadelphia, for Westinghouse Electric, appellee (at 1112, 1113, 1114 and 1248).

Before CIRILLO, OLSZEWSKI and CERCONE, JJ.

CIRILLO, Judge:

Charles and Bonnie Oblon and Keystone Engineering Company ("Keystone") have filed consolidated appeals from orders entered on March 8, 1990, and April 17, 1990 in the Philadelphia County Court of Common Pleas. We affirm.

On February 20, 1983, a fire occurred at the Ludlow Fourth Building at 400 Market Street in Philadelphia. Thereafter, Charles Oblon, an electrician, began working to repair the electrical equipment damaged by the fire. On February 22, 1983, multiple electrical explosions occurred causing burn injuries to Oblon's face, hands, arms and part of his back.

Thereafter, Oblon commenced two actions, based upon negligence and strict liability, see 402A Restatement of Torts (2d), against Bressman and Carol ("B & C"), designer of the electrical plans for the Ludlow Fourth Building; Westinghouse Electric Corporation ("Westinghouse"), designer and manufacturer of the equipment that Oblon was repairing when injured; Keystone, which assembled and installed the electrical equipment; and Philadelphia Electric Company, ("PECO"), which allegedly selected the type of

fuse which protected the electrical equipment that Oblon had been repairing when he was injured.

The two actions were consolidated and a jury trial commenced on January 30, 1990. Following a seven week trial, the jury was given ten questions to answer.[1] The jury,

1. The Jury Verdict Questionnaire, in relevant part, read as follows:
 1) Do you find by the preponderance of the evidence that any of the defendants was negligent?
 Westinghouse ... Yes
 [B & C] Yes
 Keystone Yes
 [PECO] Yes
 ... If you answer "YES" as to any defendant, proceed to next question.
 2) Was the negligence of those defendants you have found to be negligent a substantial factor in bringing about Charles Oblon's harm?
 Westinghouse ... Yes
 [B & C] Yes
 Keystone ... Yes
 [PECO] Yes
 ... [I]f you answer "YES" as to any defendant, proceed to next question.
 3) Do you find by a preponderance of the evidence, that the plaintiff Charles Oblon was contributorily negligent?
 YES
 4) If you answered Question 3 "YES," was Charles Oblon's negligence a substantial factor in bringing about his harm?
 YES
 5) Taking the combined negligence that was a substantial factor in bringing about Charles Oblon's harm as 100 percent, what percentage of that causal negligence was attributable to each of the defendants you have found causally negligent and what percentage was attributable to Charles Oblon?
 ... Westinghouse.... 17%
 ... [B & C] ... 32%
 ... PECO ... 4%
 ... Keystone ... 18%
 ... Charles Oblon 29%
 * * *
 6) Do you find that Charles Oblon knew of the specific danger posed by working in a cabinet with energized bus bars?
 YES
 7) If you answer Question 6 "YES," was that a substantial factor in causing his injuries?
 NO
 8) Do you find that there was a defect in the equipment when it left Westinghouse for installation at 400 Market Street?
 NO

however, was unable to reach a unanimous verdict.[2] Subsequently, Oblon's request for a verdict to be entered on the issue of liability was denied. Oblon also filed a post-trial motion to mold the verdict which was accompanied by affidavits that Oblon's attorney had obtained *ex parte* from jurors eight and nine and an affidavit from Charles Oblon in which he stated that he would accept the jury award of $1,000,000.00. Oblon's motion to mold the verdict was denied. PECO's post-trial motion for judgment on the entire record was granted. Keystone's post-trial motions for judgment notwithstanding the verdict, judgment upon the entire record, and for indemnity against B & C and Westinghouse were denied. As such, the trial court granted a new trial on all issues between Oblon and Westinghouse, B & C, and Keystone. Oblon and Keystone filed timely appeals. We will initially address the claims asserted in Oblon's appeal.

I. The trial court erred in denying [Oblon's] motion to mold the verdict despite the affidavits of jurors [eight and nine] which unambiguously demonstrated that there was not an irreconcilable inconsistency in the jury verdict and that the jurors all agreed that appellees were negligent.

A. The trial court erred in refusing to consider the affidavits of jurors [eight and nine].

9) Do you find that the defective condition caused the physical harm suffered by Mr. Oblon?
[unanswered]
10) State the amount of damages, if any, sustained by each plaintiff as a result of the accident without regard to and without reduction by the percentage of causal negligence, if any, that you have attributed to the plaintiff.
Plaintiff Charles Oblon $1,000,000.00
Plaintiff Bonnie Oblon $ 0

2. The jurors were polled after the verdict was stated. Jurors one through seven agreed with the verdict as stated. However, jurors number eight and nine did not agree with the jury verdict. The trial judge discharged jurors one through seven and questioned jurors eight and nine. The transcript of the polling of the jurors was not included in the original record on appeal.

B. There was not an irreconcilable inconsistency in the jury verdict and the verdict should have been molded to reflect the intent of the jurors.

C. The trial court erred in failing to enter judgment against appellees on the issue of negligence.

II. The trial court erred in granting defendant, [PECO's] motion for judgment based on the record after the jury found [PECO] negligent.

 When reading issues I, I(a) and I(b), Oblon's argument is essentially that since the juror affidavits were used merely to explain and clarify their responses to the answers contained in the jury verdict questionnaire, the trial court erred in refusing to consider the affidavits and in refusing to mold the verdicts based upon the statements in the affidavits. Specifically, Oblon argues that a combination of the information contained in the affidavits and the information set forth in the jury verdict questionnaire demonstrates a consensus among the jurors that Oblon was no more than twenty-nine percent negligent.

Here, although the jury verdict questionnaire evidenced a consensus, a poll of the jurors revealed that there was in fact no agreement as to percentages of fault and amount of damages that Oblon should be awarded. In Pennsylvania, for a verdict to be valid five-sixth's of the jury must agree. 42 Pa.C.S. § 5104(b). In the instant case, a polling of the jury revealed that only seven of the nine jurors agreed to the verdict. As such, there was no verdict.

It has long been the rule in Pennsylvania that the only verdict is that which is announced orally in court by the jury, and if at that time any juror disagrees, with or without poll, before the verdict is recorded then there is no verdict.

*Barefoot v. Penn. Central Transp. Co.*, 226 Pa.Super. 558, 323 A.2d 271 (1974); *see also Havranek v. Pittsburgh*, 344 Pa. 375, 25 A.2d 703 (1942); *Friedman v. Ralph Bros., Inc.*, 314 Pa. 247, 171 A. 900 (1934); *Eastley v. Glenn*, 313 Pa. 130, 169 A. 433 (1933); *Scott v. Scott*, 110 Pa. 387, 2 A. 531 (1885). Consequently, since jurors number eight and nine

disagreed with the verdict as stated before it was recorded, there was no verdict. *Barefoot, supra.*

■ Moreover, the trial court properly refused to consider the affidavits of jurors number eight and nine obtained *ex parte* three weeks after the jury had been discharged. It is well settled that unless there is evidence which would indicate the existence of extraneous influences which may have affected the jury's deliberations, affidavits of jurors, if introduced to impeach a jury verdict, may not be considered by a court in deciding a motion for a new trial. *Pittsburgh National Bank v. Mutual Life Ins. Co. of New York,* 493 Pa. 96, 425 A.2d 383 (1981); *Fink v. Commonwealth,* 85 Pa.Commw. 290, 482 A.2d 281 (1984). The rationale underlying the above rule is as follows:

> The only act performed by the jury to which any legal significance is attached is the *rendering of the verdict.* "[T]he verdict as uttered is the sole embodiment of the jury's act ... The policy which requires this is the same which forbids a consideration of the negotiations of parties to a contract leading up to the final terms ..., namely, the loss of all certainty in the verdict, the impracticability of seeking for definitiveness in the preliminary views, the risk of misrepresentation after disclosure of the verdict, and the impossibility of expecting any end to trials...."

*Commonwealth v. Zlatovich,* 440 Pa. 388, 396–397, 269 A.2d 469, 473 (1970) (emphasis original, citations omitted). Oblon cites a number of cases from other jurisdictions which allowed juror affidavits to *explain* a jury verdict. Here, however, no verdict was reached. Indeed, to manufacture a jury verdict, the trial court would have had to consider the jurors' affidavits, a request which it properly denied. Our supreme court in *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A.2d 861 (1960), cogently stated:

> The practice of interviewing jurors after a verdict and obtaining from them ex parte, unsworn statements in answer to undisclosed questions and representations by the interviewers is highly unethical and improper and was

long ago condemned by this court in *Cluggage's Lessee v. Swan*, 1811, 4 Bin. 150, 158, reiterated and reaffirmed in *Friedman v. Ralph Bros., Inc.*, 314 Pa. 247, 249, 171 A. 900, 901 [ (1934) ], and again quoted from at length in *Redmond v. Pittsburgh Railways Co.*, 329 Pa. 302, 303–304, 198 A. 71, 72 [ (1938) ]. *It is forbidden by public policy: Commonwealth v. Greevy*, 271 Pa. 95, 99, 114 A. 511, 512 [ (1921) ]. Certainly such post-trial statements by jurors are not to be given weight on even an application for a new trial, much less a petition for a writ of habeas corpus.

*Id.*, 400 Pa. at 223, 161 A.2d at 873 (quoting *Commonwealth ex rel. Darcy v. Claudy*, 367 Pa. 130, 133–134, 79 A.2d 785, 786 (1951)) (emphasis original). Here, although the statements given by jurors eight and nine were in the form of a sworn affidavit, we do not feel that this, without more, requires the trial court to give any consideration to the statements. Indeed, *Kravitz* plainly states that obtaining statements from jurors *ex parte* is *"highly unethical and improper." Id.* (quoting *Claudy*, 367 Pa. at 133, 79 A.2d at 785 (emphasis original)). Simply because the instant statements were submitted in the form of a sworn affidavit does not convert otherwise improper behavior into clever post-trial stewardship.

As stated earlier "the verdict, as uttered, is the sole embodiment of the jury's act." *Zlatovich*, 440 Pa. at 396, 269 A.2d at 473. Likewise, where the jury does not reach a verdict, that is also the sole embodiment of their act. It is the process which resulted in their failure to agree, or in their agreement, that is inviolable and must be protected. In the absence of extraneous influences, the jury's verdict, or their failure to reach one, cannot, and should not be impeached by affidavits obtained *ex parte* three weeks after the jury has been discharged.

It follows therefore that the trial court did not err in refusing to mold the verdict. In order for the trial court to mold a verdict, the intention of the jury must be clear. *Krock v. Chroust*, 330 Pa.Super. 108, 478 A.2d 1376 (1984).

Where five sixth's of the jury cannot agree on the parties' proportion of fault, or the plaintiff's amount of damages, their intention is not clear. In short, where the jury has not reached a verdict, the court has no power to mold one. *See Bowie v. Shelton*, 214 Pa.Super. 107, 251 A.2d 667 (1969).

Next, Oblon argues that the trial court erred in failing to enter judgment against all defendants on the issue of negligence and in granting a new trial on all issues. Oblon contends that a new trial should have been limited to the issue of his contributory negligence and the amount of damages. We disagree. Initially, we note that the grant of a new trial will not be disturbed on appeal unless there is evidence of a clear abuse of discretion or error of law. *Spang & Co. v. U.S. Steel Corp.*, 519 Pa. 14, 545 A.2d 861 (1988).[3]

Although the grant of a new trial generally means a new trial as to all parties and all issues raised by the pleadings, *Rivera v. Philadelphia Theological Seminary*, 510 Pa. 1, 507 A.2d 1 (1986), our courts have granted limited new trials. *See Cason v. Smith*, 188 Pa.Super. 376, 146 A.2d 634 (1959) (new trial limited to the issue of damages); *see also Rivera, supra* (new trial limited to determining one defendant's proportionate responsibility to co-defendant). Oblon, however, has not cited any authority for the grant of a new trial limited to the issues of the defendants' negligence and the plaintiff's contributory negligence where the jury could not reach a unanimous verdict after a trial where the issues of liability and damages were tried together. Moreover, since the trial was not bifurcated, once Oblon was determined to be contributorily negligent, the amount of his contributory negligence was dependent upon and

---

**3.** The relief Oblon requests is inherently inconsistent. Although it is clear that the jury found that all defendants were negligent, eight of the nine jurors also found that Oblon was contributorily negligent. Therefore, to be consistent, Oblon should request that the court enter a verdict against all parties as to liability and limit the new trial to a determination of each party's responsibility for damages. This request would assume that the jury on retrial could not find Oblon more than fifty percent contributorily negligent. *See* 42 Pa.C.S. § 7102.

intertwined with the percentages of the defendants' negligence. *See* 42 Pa.C.S. § 7102(a). Additionally, it is possible that the percentages of negligence assigned to the defendants and Oblon were compromises which embodied concepts of liability and percentage of fault. Specifically, the jury may have settled their disagreements by trading off liability against the amount of damages. In any event, we cannot find that the trial court abused its discretion in refusing to grant a new trial which would assume that all the defendants were negligent and limit the issues on retrial to Oblon's contributory negligence and the amount of damages. *Spang, supra.*

Oblon next argues that since the jury found that PECO was negligent, the trial court erred in granting its motion for judgment based upon the entire record. Conversely, PECO, on the basis of the evidence elicited during its cross-examination of Morton Lerner, Oblon's electrical engineering expert, argues that it is entitled to judgment based upon the entire record. PECO does not argue that Mr. Lerner was unqualified to offer opinion testimony, but that Mr. Lerner's expert testimony was purely speculative and could not establish that PECO's selection of a fuse rated at 175 amps contributed to Oblon's injuries. PECO also maintains that since Oblon has not established a causal connection between PECO's selection of the fuse and Oblon's injuries it is entitled to judgment on the record. We agree.[4]

In reviewing an appeal from the entry of a judgment based upon the entire record, we must consider the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Bahoric v. St. Lawrence Creation No. 13 of Steelton,* 426 Pa. 90, 230 A.2d 725 (1967). Here, there was evidence that PECO decided that the size of the primary side fuses used to protect its lines at

4. Although significant portions of the transcript from the seven week trial are not included in the record on appeal, since the case against PECO was premised entirely upon the expert testimony of Morton Lerner, the transcript of which is included in the record on appeal, we will address this claim.

the Ludlow–Fourth building would be 175 amperage fuses.[5] Initially, on direct examination Mr. Lerner testified that a fuse rated at 175 amp was oversized for the equipment and that once a short circuit occurred the oversized fuse allowed electricity to build up more intensely than would a smaller sized fuse and that this build up resulted in a more severe explosion which eventually caused, or at least contributed to, Oblon's injuries. Mr. Lerner claimed that a smaller sized fuse would have shut the flow of power more quickly, thereby resulting in a smaller explosion and presumably, less severe injuries. On cross-examination, Mr. Lerner stated that, under the circumstances, the 175 amp fuse conformed to the requirements of the National Electric Code. Mr. Lerner also stated that if a secondary circuit breaker had been installed, the 175 amp fuse would have been sufficient.[6]

Mr. Lerner conceded that to determine at what point the fuse "blew" he would need to know the fault current which resulted from the short circuit. Mr. Lerner, however, could only estimate that the fault current was between ten thousand and one-hundred and fifty thousand amps. Mr. Lerner also stated that depending on the fault current, a 100 amp fuse would "blow" in relatively the same time as a 175 amp fuse. It was also conceded by Mr. Lerner that a fuse of least 100 amp was needed to handle the output of electricity.

Consequently, Mr. Lerner's conclusion that a smaller sized fuse should have been installed was premised upon his knowing the level of the fault current created at the time of the accident. Because Mr. Lerner did not know, nor could he opine, what the fault current was at the time of the accident, there is no factual foundation to support his opinion that a smaller fuse of 100 amp would have blown more quickly than the 175 amp fuse. *See Clark v. Penn-*

5. Fuses and circuit breakers are circuit protection devices which "trip open" when a circuit becomes overloaded.

6. Oblon does not maintain that the installation of the secondary circuit breaker was PECO's responsibility.

*sylvania Power & Light,* 336 Pa. 75, 6 A.2d 892 (1939). Thus, Mr. Lerner's claim that the 175 amp fuse contributed to Oblon's injuries was purely speculation. In effect, Mr. Lerner's testimony built a presumption upon a presumption, which is prohibited. *Auerbach v. Philadelphia Transportation Company,* 421 Pa. 594, 602, 221 A.2d 163, 170 (1966).

Because Mr. Lerner could not opine as to the fault current at the time of the accident, he could not, with any degree of legal certainty, comment on the propriety of the selection of a 175 amp fuse. As such, Oblon did not prove that the act of selecting a 175 amp fuse was causally connected to his injuries. Without any competent proof that PECO's conduct was casually connected to Oblon's injuries, Oblon could not prevail on a claim of negligence. *See Evans v. Goldfine Truck Rental Service,* 241 Pa.Super. 329, 334, 361 A.2d 643 (1976) (to establish a *prima facie* case of negligence, plaintiff must offer evidence that defendant owed duty to plaintiff and breach of duty was proximate cause of plaintiff's injury); *see also Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680 (1983); *Hamil v. Bashline,* 481 Pa. 256, 265, 392 A.2d 1280, 1284 (1978) ("it is incumbent on a plaintiff to establish a causal connection between defendant's conduct and the plaintiff's injury"). We therefore find that, viewing the entire record in the light most favorable to Oblon, the trial court properly determined that PECO was entitled to judgment on the record.

█ We will now address the merits of Keystone's appeal. Keystone first argues that the trial court erred in denying its motions for judgment n.o.v. and judgment based upon the entire record. Keystone contends that since the jury found that the equipment was not defective when it left Westinghouse for installation at 400 Market Street, it cannot be liable.[7] A motion requesting judgment n.o.v. and a motion requesting judgment based upon the entire record

---

7. Initially, since, we have determined that there was no verdict, it would be difficult for Keystone to prevail on a claim praying for judgment notwithstanding a verdict that was never entered.

require that we view the facts in the light most favorable to the non-moving party and draw all reasonable inferences therefrom. *See Wenrick v. Schloemann–Siemag, etc.,* 523 Pa. 1, 564 A.2d 1244 (1989); *Bahoric, supra.*

However, since Keystone has not provided us with a sufficient original record, we cannot review its claim that it is entitled to judgment based upon the entire record. Namely, Keystone has not provided us with relevant portions of the trial transcript. We hasten to remind Keystone that, as the appellant in this appeal, it is required to supply this court with a complete record for purposes of appellate review. Pa.R.A.P. 1911[8]; *Commonwealth v. Buehl,* 403 Pa.Super. 143, 588 A.2d 522 (1991). *See also* 1 Pennsylvania Appellate Practice § 1911:2 (1986). More importantly, an appellate court may only consider facts which have been duly certified in the record on appeal. *Commonwealth v. Young,* 456 Pa. 102, 115, 317 A.2d 258, 264 (1974); *Kilian v. Allegheny County Distributors, Inc.,* 409 Pa. 344, 349, 185 A.2d 517, 519 (1962); *Buehl, supra.*

We refer Keystone to Pennsylvania Rule of Appellate Procedure 1923[9] which provides that

**8.** Pennsylvania Rule of Appellate Procedure 1911 provides in pertinent part:

(a) General Rule. The appellant shall order any transcript required under this chapter in the manner and make any necessary payment or deposit therefor in the amount and within the time prescribed by Rules 5000.1 et seq. of the Pennsylvania Rules of Judicial Administration (court reporters).
Pa.R.A.P. 1911(a).

**9.** Rule 1923. Statement in Absence of Transcript

If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including his recollection. The statement shall be served on the appellee, who may serve objections or propose amendments thereto within ten days after service. Thereupon the statement and any objections or proposed amendments shall be submitted to the lower court for approval and as settled and approved shall be included by the clerk of the lower court in the record on appeal.
Pa.R.A.P. 1923. Rule 1923's purpose is to provide reviewing courts with an "equivalent picture" of the proceedings when there is not a

if a transcript is unavailable, the appellant may prepare a statement of the proceedings from the best available means, including his or her recollection. Pa.R.A.P. 1923. The statement may then be served upon the appellee who, within ten days, may raise objections or propose changes to the statement. *Id.* Thereafter, the statement must be submitted to the relevant trial court for approval and the statement, as approved, will then be included in the record on appeal. *Id.*

*Buehl,* slip op. at 5–6 (footnote omitted). Without an adequate record, we cannot conclude that the trial court erred in denying Keystone's motions for judgment n.o.v. and judgment based upon the entire record. Therefore, we dismiss these claims.

Lastly, Keystone contends that the trial court erred in denying its motion for indemnity against B & C and Westinghouse. We disagree. One is entitled to indemnity if that person, although not at fault, becomes legally obligated to pay damages to a plaintiff who has suffered injury caused by a third party. *Burbage v. Boiler Engineering and Supply Co.,* 433 Pa. 319, 249 A.2d 563 (1969). Since there is no verdict in this case, Keystone is not legally responsible to pay anyone. *Id.* As such, Keystone's motion for indemnity was premature and was properly denied.

Orders affirmed.

transcription. *Buehl,* 588 A.2d at 524 n. 7; *Smith v. Mason,* 328 Pa.Super. 314, 316 n. 12, 476 A.2d 1347, 1348 n. 1 (1984).