798 A.2d 742

**John MONTGOMERY and Marsha Montgomery, his Wife**

**v.**

**Vitasta BAZAZ–SEHGAL, M.D., Executrix of the Estate of Kuldeep Sehgal, M.D., Deceased, Greater Pittsburgh Impotence Center and Aliquippa Hospital,**

**Appeal of Vitasta Bazaz–Sehgal, M.D., Executrix of the Estate of Kuldeep–Sehgal, M.D., Deceased, and Greater Pittsburgh Impotence Center.**

Supreme Court of Pennsylvania.

Argued March 5, 2001.

Decided June 18, 2002.

576

Linton L. Moyer, Templeton Smith, Pittsburgh, for appellants, Vitasta Bazaz–Sehgal, M.D., Executrix of the Estate of Kuldeep Sehgal et al.

Peter J. Pietrandrea, Cranberry Tp., for appellees, John and Marsha Montgomery.

Before FLAHERTY, C.J., ZAPPALA, CAPPY, CASTILLE and SAYLOR, JJ.

### OPINION OF THE COURT

Justice CASTILLE.

In this appeal, this Court reaffirms that the doctrine of informed consent, whether involving non-consensual surgery or a lack of informed consent, sounds in battery, not in negligence, despite observations to the contrary in the published Superior Court opinion below. The appeal also presents the question of whether, and when, expert medical testimony is necessary to prove damages resulting from a medical battery. On this question, we are in agreement with the careful distinction drawn by the Superior Court and, hence, we affirm its mandate.

In August of 1989, appellee, John Montgomery, began treating with Dr. Kuldeep Sehgal,[1] a board certified urologist specializing in male impotence, for complaints of premature ejaculation and inability to maintain an erection. Sehgal took a history, performed a complete physical examination and ordered tests. Sehgal's ultimate diagnosis was that Montgomery's impotence was caused by Peyronie's disease [2] and a

---

1. Dr. Sehgal died while the Superior Court appeal was pending. On October 12, 1999, that court granted the application of his widow, Vitasta Bazaz–Sehgal, M.D., for substitution of personal representation.

2. Peyronie's disease is an accumulation of plaque in the corpora cavernosa, which are two cylinder-like structures inside the penis through which blood must flow to create an erection.

slight venous leak, resulting in an insufficient blood supply to his penis to form and maintain an erection. The following month, in an effort to treat Montgomery's impotence non-surgically, Sehgal administered injections of Papaverine and Regitine, medications which are designed to increase the blood flow in the penis.

In February of 1990, Montgomery returned to Sehgal and reported that the injections had not improved his condition. Sehgal decided that corrective surgery was necessary. On March 30, 1990, Sehgal performed surgery on Montgomery at Aliquippa Hospital during the course of which he implanted an inflatable pump prosthesis in Montgomery's penis. The facts to this point are undisputed; it is the nature of the surgery performed, and whether Montgomery consented to the specific procedure, that is disputed.

Since the legal questions involve the propriety of the trial court's refusal to permit any aspect of appellees' case to go to the jury, the primary focus here must be upon appellees' evidence. Appellees claimed that, prior to the surgery, Sehgal merely told them he intended to perform a revascularization, an outpatient procedure. A revascularization is designed to open and repair the blood vessels leading to the penis to increase blood flow. Appellees alleged that the possible insertion of a penile implant was not discussed with them prior to the surgery, nor did John Montgomery ever consent to the implantation of the prosthesis—a procedure which resulted in Montgomery being admitted to the hospital for several days. Appellees claimed that they first learned of the implantation when Montgomery awoke from the surgical anesthesia and a nurse presented him with a warranty card for the prosthesis. Montgomery asked the nurse whether there was some mistake, whereupon the nurse informed him that the prosthesis had been implanted in his penis. Dr. Sehgal denied appellee's claim that he never informed appellees about the prospect of implanting a penile prosthesis.

Appellees then tried to reach Sehgal by telephone but were unable to speak to him until three days after surgery, when Sehgal appeared in Montgomery's hospital room to discharge

him.  Appellees asked Sehgal why he had implanted the prosthesis, and the doctor explained that he was saving Montgomery from a second surgical procedure at some later date. John Montgomery replied that it was not up to the doctor, but up to him to determine whether he wanted such an object placed in his body.  Montgomery also told Seghal that he did not want the prosthesis and wanted it removed, but Sehgal informed him that removal was not an option because there was "nothing there now."

According to Marsha Montgomery, when her husband was discharged, he remained in a "state of shock," and was also in "plenty of pain" from the surgery.  John Montgomery testified that he has never gotten used to the device.  He explained that he had to be careful how he sits because it is "like sitting on a pin cushion," the device hurts at times, and there had been times "that it felt like it wanted to come out through the head of it and it is plain discomfort."  Montgomery also testified to the mental effect of the implantation of the prosthesis, explaining that:

> I sure as hell don't feel like a man, I'll tell you that.  I don't feel one bit like a man.  I mean, I felt like half a man before because I had ejaculated early but I don't feel like no man, even half a man anymore because I go [sic] to pump this thing up.  Like I told my wife, I feel like I am a machine.

N.T. 1/12/98 at 179.  Montgomery also testified that he could not achieve an erection without employing the device and that there is no sensation or "fulfillment" upon ejaculation.

Appellees filed suit on May 28, 1993, alleging professional negligence, lack of informed consent and battery.  Appellees failed to identify any liability expert witnesses by the date established by the trial court, causing the trial court to issue an order on June 15, 1995, which precluded appellees from calling any liability expert witnesses at trial.  On September 15, 1995, Dr. Sehgal and Greater Pittsburgh Impotence Center,[3] relying on the trial court's preclusion order, filed a

---

3. Aliquippa Hospital was dismissed from the case during trial with no opposition from any other party.  Therefore, Sehgal and Greater Philadelphia Impotence Center were the sole remaining defendants.

motion for partial summary judgment arguing that appellees could not prove their professional negligence claim absent expert testimony and requesting that the negligence claim be dismissed. The trial court granted the motion on November 8, 1995.

The matter then proceeded to a jury trial on the lack of informed consent and battery claims. At the close of appellees' case, appellants motioned for compulsory non-suit on the grounds that appellees could not prove a connection between the alleged battery and the requested damages without expert testimony. The trial court denied the motion, finding that Montgomery's testimony regarding his objection and reaction to the presence of the prosthesis and the fact that it was cumbersome did not require supporting expert testimony because the connection to the tortious conduct was obvious:

> Mr. Montgomery's protestations to the presence of the prosthesis do[ ] not require an expert for him to say that it is cumbersome and he never expected it to be there. I don't think that would require an expert. . . . [E]xpert medical testimony is necessary to establish the causal nexus of the injury to the tortious conduct in those cases where the connection is not obvious. Clearly, as to the things of which [appellees' counsel] complained, the connection is obvious.

At the close of all evidence, appellants moved for a directed verdict on the same ground alleged in support of a non-suit. This time, the trial court, after reviewing Montgomery's testimony that he had a reduced or different physical sensation in his penis, was unable to feel the physical pleasures of intercourse and could not sustain an erection without inflating the prosthesis with a pump, determined that expert testimony was necessary to connect this sort of **physical** injury to the implantation of the prosthesis and granted a directed verdict as to those damages. As to the mental anguish and loss of consortium components of appellees' claims, the trial court initially denied the motion for directed verdict on the same basis that it had denied appellants' motion for non-suit. After further discussion with the parties, however, the trial court reversed itself and found that appellees' claims for mental

anguish and loss of consortium also could not be sustained absent expert testimony. The trial court concluded that it could not determine the dividing line between which damages would require medical testimony and which would not. Thus, the trial court granted a directed verdict as to all remaining aspects of the case.

Upon appeal by the Montgomerys, a divided panel of the Superior Court issued a published opinion reversing and remanding to the trial court to permit appellees the opportunity to pursue the battery claim and certain claims for damages without the necessity of producing an expert witness. *Montgomery v. Bazaz–Sehgal*, 742 A.2d 1125, 1134 (Pa.Super.1999). The majority opinion, authored by the late former President Judge Cirillo, began by opining that the differences between a medical battery case and "a medical malpractice informed consent case grounded in negligence" were at the "heart" of the appeal. Among those differences was the fact that an informed consent case requires expert medical testimony to establish the physician's duty, while a medical battery claim requires only a showing of a non-consensual contact. The court then noted that the matter *sub judice* involves a battery claim, and not a claim of negligence/informed consent.

On the battery claim, the court concluded that the evidence that Dr. Seghal had implanted an inflatable prosthesis into John Montgomery's penis, without his permission, was sufficient to warrant the jury in a finding that a battery was committed. Turning to the question of damages, and whether medical testimony was required to prove damages, the court took issue with the trial court's inability to draw a "dividing line" between which alleged damages resulting from the battery would require medical expert testimony and which would not. In the Superior Court's view, the law was clear that compensatory damages were available in a medical battery action, even in the absence of expert testimony, for "direct, obvious and foreseeable results" of the battery. It is only where the connection between the battery and the harm is not obvious that expert testimony is required. Applying this distinction, the court determined that any injury involving

Montgomery's "physical sensation" would require expert testimony since, in light of his preexisting condition, the causal connection between the battery and any diminished physical sensation was not so obvious as to be within the range of ordinary experience of non-experts. On the other hand, the causal connection between the battery and the alleged mental and emotional injuries arising from a non-permitted implantation of the prosthesis was sufficiently clear and direct that that question should have been left to the jury.[4]

■ This Court granted discretionary review to consider two claims: (1) whether expert medical testimony is necessary to prove that the performance of a surgical procedure—here, the implantation of a penile prosthesis—to which a patient did not consent caused mental/emotional injury to the patient; and (2) whether the Superior Court was correct that non-consensual surgery cases are distinguishable from informed consent cases because non-consensual surgery constitutes a battery, while lack of informed consent sounds in negligence. Although we disagree with the Superior Court on the latter point, that disagreement does not affect our ultimate judgment, for we agree with the Superior Court that expert testimony was not necessary for appellees' mental and emotional damages claim to go to the jury.[5]

■ We will address the second issue first, given its importance and relevance as background about the very nature of informed consent and medical battery. "It has long been the law in Pennsylvania that a physician must obtain

---

4. Judge Popovich dissented on grounds that he was "not convinced that the evidence of causation of [appellees'] psychological injuries is sufficiently simple, obvious, clear and direct to allow recovery in the absence of expert testimony." Thus, it appears that Judge Popovich agreed with the majority's legal standard, but disagreed with its application of that standard.

5. The issues in this appeal are purely questions of law which, of course, are subject to plenary review by this Court. *E.g. Navickas v. Unemployment Compensation Review Board*, 567 Pa. 298, 787 A.2d 284, 288 (2001), citing *Temple University v. Unemployment Compensation Board of Review*, 565 Pa. 178, 772 A.2d 416, 418 n. 1 (2001); *Caterpillar, Inc. v. Unemployment Compensation Board of Review*, 550 Pa. 115, 703 A.2d 452, 456 (1997).

informed consent from a patient before performing a surgical or operative procedure." *Morgan v. MacPhail,* 550 Pa. 202, 704 A.2d 617, 619 (1997), citing *Sinclair v. Block,* 534 Pa. 563, 633 A.2d 1137 (1993); *Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966).

The informed consent doctrine requires physicians to provide patients with "material information necessary to determine whether to proceed with the surgical or operative procedure or to remain in the present condition." *Sinclair by Sinclair v. Block,* 534 Pa. 563, 633 A.2d 1137, 1140 (1993). We have on several occasions defined the nature of this "material information." We have stated that the information provided by a physician must give the patient "a true understanding of the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results." *Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663, 674 (1966). Thus, a physician must "advise the patient of those material facts, risks, complications and alternatives to surgery that a reasonable person in the patient's situation would consider significant in deciding whether to have the operation." *Gouse v. Cassel,* 532 Pa. 197, 615 A.2d 331, 334 (1992). **A claim that a physician failed to obtain the patient's informed consent sounds in battery.** *Id.; see also Morgan v. MacPhail,* 550 Pa. 202, 704 A.2d 617 (1997). *Duttry v. Patterson,* 565 Pa. 130, 771 A.2d 1255, 1258 (2001) (emphasis supplied). As this Court has emphasized, the informed consent doctrine derives from the very fact that surgical or operative procedures, if not consented to, amount to a battery:

The rationale underlying requiring informed consent for a surgical or operative procedure and not requiring informed consent for a non-surgical procedure is that the performance of a surgical procedure upon a patient without his consent constitutes a technical assault or a battery because the patient is typically unconscious and unable to object. *Morgan v. MacPhail,* 704 A.2d at 620, *citing Gray v. Grunnagle,* 223 A.2d at 668–69. *See also Gouse v. Cassel,* 615 A.2d at

334 ("Lack of informed consent is the legal equivalent to no consent; thus, the physician or surgeon who operates without his patient's informed consent is liable for damages which occur, notwithstanding the care exercised").

■■ Thus, this Court has made clear on repeated occasions over a period of several decades that a claim based upon a lack of informed consent involves a battery committed upon a patient by a physician, an action which is distinct from a claim of a consented-to, but negligently performed, medical treatment. Since surgery performed without a patient's informed consent constitutes a technical battery, negligence principles generally do not apply. It follows, of course, that a claim involving a surgical procedure performed without any consent at all by the patient, such as the implantation in the case *sub judice*, also sounds in battery, and negligence requirements have no bearing on the matter. Indeed, a claim concerning the lack of consent for surgery can be maintained even where there is no allegation of negligence in the actual performance of the procedure. While negligence claims and informed consent claims often co-exist in the same tort action, they need not do so. A lack of informed consent or a lack of consent claim is actionable even if the subject surgery was properly performed and the overall result is beneficial.

■ In light of this discussion, it is apparent that the Superior Court erred in stating that, "[t]he differences between a medical malpractice informed consent case grounded in negligence (commonly referred to as an "informed consent" case) and one based on battery are at the heart of this case and must be kept clearly in mind." *Montgomery v. Bazaz–Sehgal*, 742 A.2d at 1130. The Superior Court also erred in further distinguishing informed consent from medical battery premised upon the alleged applicability of negligence principles in informed consent cases. *Id.* ("Another difference is that while an informed consent negligence claim requires the presentation of expert testimony in order to establish the physician's duty ..., a medical battery claim does not") (citation omitted). No such distinction exists in our jurisprudence. Lack of consent for surgery involves the same general concept

without regard to whether consent was uninformed or completely lacking. The result is the same—the patient is subjected to a surgical procedure to which he did not consent.

▮ ▮▮▮ The fact that the Superior Court misconceived the battery contours of the informed consent doctrine, however, did not affect its approach to the specific question of damages that led to its reversal in this case, since the claim at issue here in fact does not involve the informed consent doctrine, but a claimed lack of consent at all for this particular procedure.[6] The Superior Court correctly set forth the parameters of an action in battery: *i.e.*, "there need be no physical injury, but only some contact; the matter of permission goes to the quality of the contact, and consent to being so touched is a defense." *Montgomery v. Bazaz–Sehgal,* 742 A.2d at 1133. Appellees unquestionably established a *prima facie* case of battery by introducing evidence that Dr. Sehgal made physical contact with John Montgomery. Specifically, appellees testified that, during consented-to revascularization surgery on Montgomery, Sehgal implanted a penile prosthesis without Montgomery's knowledge or consent. This contact left a palpable reminder in the form of the prosthesis, which Montgomery discovered only after he awoke. This evidence was sufficient to allow a jury to pass on the question of whether Sehgal committed a battery.

6. Beyond accurately pointing out the error in the Superior Court's description of informed consent as negligence-based, appellants do not articulate in any persuasive fashion how that error prejudiced them. Appellants note that the Superior Court's error led it to disregard their argument premised upon relevant authority in the form of the Superior Court's informed consent decision in *Maliszewski v. Rendon,* 374 Pa.Super. 109, 542 A.2d 170 (1988). Appellants' argument based upon *Maliszewski* is to the effect that, in informed consent cases, the plaintiff must produce expert medical testimony to prove that the surgery caused the **physical** injuries for which the plaintiff seeks recovery. Brief for Appellants, 12–16. As our discussion *infra* will make clear, the Superior Court in this case was careful in its opinion to distinguish between claims for damages based upon physical injuries, for which it agreed that expert testimony was necessary, and claims for mental or emotional damages, which it held did not require expert testimony. Accordingly, the error identified by appellants in Superior Court's approach did not affect that court's decision on the controlling issue before us.

■ We turn now to the issue of whether appellees were required to present expert testimony to prove that the implantation of the penile prosthesis without Montgomery's consent caused appellees' alleged mental and emotional injuries. The Superior Court correctly set forth the governing law with respect to the need for expert testimony in a case of alleged battery. It has long been the law that damages for emotional injuries are compensable, even in cases not involving negligence, where there is some evidence of physical contact or injury, even if the physical contact or injury is trivial in nature. In *Hess v. Philadelphia Transp. Co.*, 358 Pa. 144, 56 A.2d 89 (1948), for example, this Court allowed damages for mental suffering where an electrical wire fell on the plaintiff's automobile while he was in the car, even though the plaintiff suffered no physical injury beyond the electrical shock he suffered when the wire contacted his automobile. " 'The nervous system is a part of the physical organization, and this affidavit sufficiently alleges a physical injury. Mental suffering, as distinct from bodily pain, can be considered in an action for damages for injury to the person, when such suffering is attendant upon and results from a physical injury.' " *Id.* at 91, quoting *North German Lloyd Steamship Co. v. Wood*, 18 Pa.Super. 488, 1901 WL 3880 (1901), citing *Wilcox v. Richmond & Danville R. Co.*, 52 F. 264 (4th Cir.1892).

■ Whether expert testimony is required to prove a causal connection between emotional injury and the physical injury suffered, of course, is a separate issue. In *Smith v. German*, 434 Pa. 47, 253 A.2d 107 (1969), the issue was whether the plaintiff's automobile accident caused his subsequent paranoia and schizophrenia. This Court set forth the following general propositions governing when expert testimony is necessary to establish damages for mental injuries:

The law of this Commonwealth is well settled as to when medical testimony will be required to establish a causal connection between the event demonstrated and the result sought to be proved. Though most of the cases deal with plaintiffs who wish to show that a certain event caused a given injury, the rules are equally applicable when a defen-

dant seeks to disprove the causal connection (the automobile accident) presented by the plaintiff by proving one (the marital difficulties) of his own. Thus in *Florig v. Sears, Roebuck & Co.,* 388 Pa. 419, 130 A.2d 445 (1957), this Court held "Where there is no obvious causal relationship, unequivocal medical testimony is necessary to establish the causal connection." See *Auerbach v. Philadelphia Transp. Co.,* 421 Pa. 594, 221 A.2d 163 (1966); *Dornon v. Johnston,* 421 Pa. 58, 218 A.2d 808 (1966). This test has resulted in medical testimony being required to prove the causal connection between a heart attack and heavy exertion thirty minutes earlier, *Washko v. George L. Ruckno, Inc.* 180 Pa.Super. 606, 121 A.2d 456 (1956), between a paralytic stroke and being struck by a swinging door, *Fink v. Sheldon Axle Co.,* 270 Pa. 476, 113 A. 666 (1921), between a refracture and failure on the part of the attending physician to be as attentive as his patient requested, *Dornon v. Johnston, supra.*

But where "the disability complained of is the natural and probable result of the injuries, the fact-finding body may be permitted to so find, even in the entire absence of expert opinion." *Florig v. Sears, Roebuck & Co., supra,* 388 Pa. at 424, 130 A.2d at 447. The two must be "so closely connected and so readily apparent that a layman could diagnose (except by guessing) the causal connection." *Id.* See *Tabuteau v. London G. & A. Co.,* 351 Pa. 183, 40 A.2d 396 (1945); *Mohr v. Desimone & Sayers,* 110 Pa.Super. 44, 167 A. 504 (1933).

*Id.* at 108–09. The *German* Court held that, while the fact that the plaintiff was emotionally upset by the accident was within the purview of the jury without the necessity of expert testimony, whether he suffered serious personality disorders arising therefrom required expert testimony.

Applying these time-tested principles respecting whether and when expert testimony is required, the Superior Court drew a careful distinction in this case between damages relating to a reduced or different physical sensation in John Montgomery's penis and damages arising from the mental

anguish and emotional impact of the very fact that the prosthesis was inserted without his knowledge and consent. That distinction, we believe, was entirely proper.

There is no question that appellees' testimony concerned both physical and emotional damages and was often overlapping. Thus, John Montgomery spoke of diminished sensation in his penis during intercourse, the fact that he could not achieve an erection without pumping up the device and that he experienced pain and discomfort "like sitting on a pin cushion" emanating from the device itself. Likewise, Marsha Montgomery testified that John was in a great deal of pain subsequent to the procedure. But there was also ample evidence of anguish and harm arising from the very fact of the presence of the unwanted device. John Montgomery testified that the prosthesis was cumbersome and embarrassing, and made him feel like a machine because he had to pump the prosthesis in order to achieve an erection. Both appellees testified that the device had a negative emotional impact on their marital relations.

■ The Superior Court correctly recognized the validity of the distinction initially drawn by the trial court between injuries arising from physical sensations—*i.e.,* John Montgomery's lack of sensation or sense of fulfillment from intercourse and the fact that he could not achieve an erection without utilizing the prosthesis—and those involving the emotional impact of the unwanted implantation of the prosthesis—*i.e.,* John Montgomery's embarrassment, his feelings of being machine-like, and the concomitant effect of the prosthesis on appellees' marital relations. Expert testimony obviously was required to prove that Montgomery's physical injuries resulted from the implantation of the device. This is true particularly in light of Montgomery's prior medical history, which included difficulties with premature ejaculation and soft erections. Absent expert testimony, the ordinary layperson would be unqualified to determine whether these diminished physical sensations were a result of the prosthesis or a result of the natural progression of Montgomery's pre-existing condition.

■ The alleged emotional injuries, however, are obvious and clearly connected to the prosthesis. It is within the range of comprehension of jurors whether emotional injuries might reasonably be attributable to the implantation of a penile prosthesis to which a patient did not consent and which he first became aware of only after awaking from anesthesia and being presented with a warranty card for the device. John Montgomery spoke directly to the emotional difference between his pre-existing condition and his condition after implantation of the prosthesis. The jury did not require an expert to explain to it the connection between an unwanted implantation of a penile prosthesis and the emotional injuries for which appellees sought recovery. That John Montgomery might suffer these types of injuries is a direct and readily foreseeable consequence of the unwanted procedure.

The law is well established that expert testimony is not necessary where the cause of an injury is clear and where the subject matter is within the experience and comprehension of lay jurors. As the Superior Court so aptly noted, laypersons are certainly capable of comprehending, without the assistance of an expert, appellees' mental and emotional damages and determining whether those difficulties were occasioned by the unwanted and unexpected implantation of a penile prosthesis. For this reason, the Superior Court decision vacating the trial court's grant of a directed verdict and remanding to the trial court on this issue is affirmed.

Justice NIGRO and Justice NEWMAN did not participate in the consideration or decision of this case.

Former Chief Justice FLAHERTY did not participate in the decision of this case.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

I join the majority in affirming the order of the Superior Court on the basis that expert testimony was not essential to support the causation component of plaintiffs' medical battery

claim seeking damages for mental and emotional injuries. I also agree that the majority has aptly summarized the Court's existing approach to informed consent claims, which, like those entailing lack of consent, are presently categorized as involving battery rather than negligence. Nevertheless, since the issue under review here involves simple lack of consent to the procedure performed, I would not utilize the appeal as a vehicle to reinforce the battery approach to lack of informed consent. Indeed, there would appear to be good reasons for the Court to select an appropriate case to undertake a reevaluation of the battery paradigm for informed consent, particularly in light of: the weight of authority in other jurisdictions; [1] the arguable incompatibility of the battery theory (and the corresponding concept of touching) with evaluation of informed consent in the context of some medical treatments such radiation therapy and administration of oral medications; the arguable disharmony between intentional tort theory and its associated scienter requirements with informed consent claims; and the discomfort of various appellate jurists with the approach such as is apparent from their opinions. [2] Of

1. Most jurisdictions treat lack of informed consent as sounding in negligence. *See, e.g., Canterbury v. Spence,* 464 F.2d 772 (D.C.Cir. 1972); *Dunham v. Wright,* 423 F.2d 940 (3d Cir.1970); *Mink v. University of Chicago,* 460 F.Supp. 713, 716–17 (N.D.Ill.1978);. *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972); *Mallett v. Pirkey,* 171 Colo. 271, 466 P.2d 466 (1970); *Nishi v. Hartwell,* 52 Haw. 188, 473 P.2d 116 (1970); *Kennis v. Mercy Hosp. Med. Ctr.,* 491 N.W.2d 161 (Iowa 1992); *Natanson v. Kline,* 186 Kan. 393, 350 P.2d 1093 (1960); *Hodge v. Lafayette General Hosp.,* 399 So.2d 744, 746 (La.App.1981); *Downer v. Veilleux,* 322 A.2d 82 (Me.1974); *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014 (1977); *Baird v. American Med. Optics,* 155 N.J. 54, 713 A.2d 1019 (1998); *Watson v. Clutts,* 262 N.C. 153, 136 S.E.2d 617 (1964); *Winkjer v. Herr,* 277 N.W.2d 579 (N.D.1979); *Scott v. Bradford,* 606 P.2d 554 (Okla.1980); *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676 (1972); *Wilson v. Scott,* 412 S.W.2d 299 (Tex.1967); *Mason v Ellsworth,* 3 Wash.App. 298, 474 P.2d 909 (1970); *Trogun v. Fruchtman,* 58 Wis.2d 569, 207 N.W.2d 297 (1973); *Roybal v. Bell,* 778 P.2d 108 (Wyo.1989).

2. *See, e.g., Morgan v. MacPhail,* 550 Pa. 202, 211–12, 704 A.2d 617, 622 (1997) (Nigro, J., dissenting); *Hoffman v. Brandywine Hospital,* 443 Pa.Super. 245, 256, 661 A.2d 397, 402 (1995) (Beck, J., concurring); *Stover v. Association of Thoracic and Cardiovascular Surgeons,* 431 Pa.Super. 11, 26 n. 6, 635 A.2d 1047, 1054 n. 6 (1993); *Wu v. Spence,* 413 Pa.Super. 352, 355–57, 605 A.2d 395, 396–97 (1992); *Malloy v.*

particular significance, the Court has not yet taken the opportunity to consider a series of recent legislative modifications to the informed consent statute,[3] which, on their face, appear to incorporate central concepts of negligence theory.

*Shanahan,* 280 Pa.Super. 440, 444–50, 421 A.2d 803, 805–08 (1980) (Hoffman, J., dissenting).

3. *See* Medical Care Availability and Reduction of Error (MCARE) Act, Act No. 2002–13, H.B. No. 1802, approved March 20, 2002 (codified as amended at 40 P.S. §§ 1303.101–1303.748 (Supp.2002)); Act of Nov. 26, 1996, P.L. 776, No. 135, § 10 (as amended, 40 P.S. § 1301.811–A) (repealed and recodified as amended at 40 P.S. § 1303.504).