J-A22034-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| NICOLE HEYER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROSEMARIE RYNKIEWICZ, D.P.M. & | : | No. 202 MDA 2020 |
| ACHILLES FOOT CENTER, P.C. | : | |

Appeal from the Judgment Entered January 29, 2020
In the Court of Common Pleas of Bradford
County Civil Division at No.:  2012MM0258


BEFORE:  SHOGAN, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 09, 2021**

Appellant Nicole Heyer appeals from the January 29, 2020 judgment entered in the Court of Common Pleas of Bradford County ("trial court") against her and in favor of Appellees Rosemarie Rynkiewicz, D.P.M. ("Dr. Rynkiewicz") and Achilles Foot Center, P.C. ("AFC") following the denial of her post-trial motions seeking judgment notwithstanding the verdict ("JNOV") or, alternatively, a new trial.  Upon review, we affirm.

On January 22, 2010, Appellant visited Dr. Rynkiewicz to seek treatment for a painful plantar fascia and a painful lesion on the bottom of her fifth metatarsal head.  As her pain continued and she experienced difficulty standing, Appellant visited Dr. Rynkiewicz again on May 10, 2010.  Dr. Rynkiewicz eventually recommended podiatric surgery.  On July 1, 2010, prior to surgery, Dr. Rynkiewicz scheduled a 45 minutes to an hour appointment

with Appellant for purposes educating her about the proposed surgical procedure and the risks involved. Dr. Rynkiewicz performed the surgery on July 9, 2010. Approximately eleven months later, on June 13, 2011, Dr. Rynkiewicz noted that Appellant's fifth toe on the right foot was overlapping her fourth toe. Thereafter, on July 17, 2012, Appellant filed a complaint against Appellees in the trial court, alleging causes of action for negligence, battery—lack of informed consent, fraud or negligent misrepresentation, and punitive damages against Dr. Rynkiewicz and negligence against AFC.[1] On June 29, 2016, the trial court granted in part Appellees' motion for summary judgment, dismissing Appellant's claim for punitive damages. The case proceeded to a multi-day jury trial, at which both parties presented testimony. At the conclusion of trial, the jury returned a defense verdict.

Appellant timely filed a motion for post-trial relief, which the trial court denied on December 18, 2019. On January 17, 2020, prior to the entry of final judgment, Appellant filed a premature notice of appeal. *See Prime Medica Assocs. v. Valley Forge Ins. Co.*, 970 A.2d 1149, 1154 (Pa. Super. 2009) (explaining that an order denying post-trial motions is interlocutory and not appealable until entry of final judgment), *appeal denied*, 989 A.2d 918 (Pa. 2010). On January 29, 2020, Appellant filed a praecipe for entry of judgment. As a result, we treat her premature notice of appeal as if filed on the day the court entered judgment. *See* Pa.R.A.P. 905(a)(5) ("A notice of

_____

[1] At the start of trial, Appellant's husband David Heyer withdrew his sole claim for loss of consortium against Appellees. *See* N.T. Trial, 4/15/19, at 1.

- 2 -

appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof."). The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant complied, challenging, *inter alia*, the weight of the evidence and the trial court's evidentiary rulings. In response, on February 19, 2020, the trial court issued a Pa.R.A.P. 1925(a) opinion, largely adopting and incorporating its December 18, 2019 opinion denying Appellant's post-trial motions.

On appeal, Appellant presents three issues for our review.

I.      Is the jury verdict for [Dr. Rynkiewicz] on [Appellant's] claim of lack of informed consent – battery against the weight of the evidence?

II.     Did the court abuse its discretion and commit an error of law by allowing Dr. Boberg to testify as an expert on Pennsylvania's informed consent doctrine because Boberg's qualifications were not allowed to be challenged during his *voir dire*?

III.    Did the court abuse its discretion and commit an error of law by not allowing subsequent treater Dr. Thomas Jiunta to testify as to his objective findings that supported his diagnosis and treatment?

Appellant's Brief at 4.

We address Appellant's claims *seriatim*. Appellant first argues that she is entitled to a new trial because the jury's verdict on her lack of informed consent claim was against the weight of the evidence.[2] *Id.* at 12.

Our standard of review for denial of a motion for a new trial based on the weight of the evidence is as follows:

> Appellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*In re Estate of Smaling*, 80 A.3d 485, 490 (Pa. Super. 2013) (*en banc*) (citation omitted). "The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 39 (Pa. 2011). The trial court may award a new trial "only when the jury's verdict is so contrary to the evidence

_____

[2] Appellant acknowledges that she is not contesting the sufficiency of the evidence underlying the verdict. Appellant's Brief at 12. To the extent Appellant invites us to credit her proffered version of the events, especially the testimony of her expert Dr. Steven Boc, or re-weigh the evidence in her favor, we decline the invitation. *See Gamesa Energy USA, LLC v. Ten Penn Ctr. Assocs., L.P.*, 181 A.3d 1188, 1191-92 (Pa. Super. 2018) (noting that "issues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determination or substitute its judgment for that of the fact finder"), *aff'd*, 217 A.3d 1227 (Pa. 2019).

as to shock one's sense of justice." ***Haan v. Wells***, 103 A.3d 60, 69 (Pa. Super. 2014) (citation omitted). "In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." ***Id.*** (citation omitted). When a fact finder's verdict is "so opposed to the demonstrative facts that looking at the verdict, the mind stands baffled, the intellect searches in vain for cause and effect, and reason rebels against the bizarre and erratic conclusion, it can be said that the verdict is shocking." ***Id.*** (citation omitted).

With the foregoing in mind, it is settled that a surgery conducted without consent constitutes battery. ***See Shinal v. Toms***, 162 A.3d 429, 452 (Pa. 2017); ***accord Montgomery v. Bazaz-Sehgal***, 798 A.2d 742, 748 (Pa. 2002) ("It has long been the law in Pennsylvania that a physician must obtain informed consent from a patient before performing a surgical or operative procedure."). As our Supreme Court has explained:

> The informed consent doctrine requires physicians to provide patients with material information necessary to determine whether to proceed with the surgical or operative procedure or to remain in the present condition. We have on several occasions defined the nature of this material information. We have stated that the information provided by a physician must give the patient a true understanding of the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results. Thus, a physician must advise the patient of those material facts, risks, complications and alternatives to surgery that a reasonable person in the patient's situation would consider significant in deciding whether to have the operation. A claim that

a physician failed to obtain the patient's informed consent sounds in battery.

As this Court has emphasized, the informed consent doctrine derives from the very fact that surgical or operative procedures, if not consented to, amount to a battery[.] The rationale underlying requiring informed consent for a surgical or operative procedure and not requiring informed consent for a non-surgical procedure is that the performance of a surgical procedure upon a patient without his consent constitutes a technical assault or a battery because the patient is typically unconscious and unable to object.

Thus, this Court has made clear on repeated occasions over a period of several decades that a claim based upon a lack of informed consent involves a battery committed upon a patient by a physician, an action which is distinct from a claim of a consented-to, but negligently performed, medical treatment. Since surgery performed without a patient's informed consent constitutes a technical battery, negligence principles generally do not apply. It follows, of course, that a claim involving a surgical procedure performed without any consent at all by the patient . . . also sounds in battery, and negligence requirements have no bearing on the matter. Indeed, a claim concerning the lack of consent for surgery can be maintained even where there is no allegation of negligence in the actual performance of the procedure. While negligence claims and informed consent claims often co-exist in the same tort action, they need not do so. A lack of informed consent or a lack of consent claim is actionable even if the subject surgery was properly performed and the overall result is beneficial.

*Id.* at 748-49 (quotation marks, citations and some emphasis omitted).

Instantly, Appellant argues that the weight of the evidence in this case demonstrates that Dr. Rynkiewicz did not obtain informed consent from Appellant and impermissibly delegated the duty to do the same to a hospital employee. We disagree. Based on our review of the record, we cannot

conclude that the trial court abused its discretion in denying Appellant's weight of the evidence claim.

At trial, Dr. Rynkiewicz testified that she scheduled Appellant for a pre-operative evaluation on July 1, 2010. N.T. Trial, Morning Session, 4/17/19, at 33. According to Dr. Rynkiewicz, at this appointment, which occurred prior the elective surgery, she reviewed with Appellant the nature of the procedure, and the risks and complications involved. *Id.* at 33-34. Dr. Rynkiewicz explained:

> [b]asically it is an informed consent day. We discuss what we're going to do, we make sure that all the questions are answered[.]"
>
> . . . .
>
> So we usually slate anywhere from 45 minutes to an hour and this is in case patients have questions about their x-rays, in case questions about what do I do with work, what do I do with the cast, how is my post-op recovery going to work, who – who can – you know we go through, who can take you home, who can bring you to the O.R., you can't drive yourself. The nurses will not allow you to get into a car. So all of these things have to be addressed.
>
> We address the prescriptions for wheel chair or handicap access, which is temporary disability for a period of the surgery. We discuss medications anesthesia, risks of surgery, so there is a lot to that particular discussion and it's to make sure that: One, the patient's informed, they understand what's to be expected, we make sure they get their pain pills before so that the[y are] not running around the day of surgery post-op with a groggy patient and somebody's trying to get their prescriptions or they're looking for crutches or wheelchairs.

*Id.* at 34-36 (sic). Dr. Rynkiewicz testified that she described the procedure to Appellant and explained to her that "there was going to be surgery on the fourth and fifth toe[.]" *Id.* at 38. Dr. Rynkiewicz further testified that she

explained to Appellant alternatives to surgery, which she characterized as "conservative measures." *Id.* at 38-39. According to Dr. Rynkiewicz, she specifically explained to Appellant she would be going to the O.R. where she would be given IV sedation before bone would be cut using power equipment. *Id.* at 40. Dr. Rynkiewicz testified that she informed Appellant that she would have to heal from the cut bone. *Id.* at 40-41. Dr. Rynkiewicz thereafter testified about the risks involved in Appellant's surgery. She recalled that, at the July 1, 2010 appointment, she informed Appellant that a risk of the contemplated surgery was infection, bone bleed, bone spurs, bleeding, phlebitis, clot formation, pulmonary embolism from a tourniquet, or complications relating to anesthesia. *Id.* at 42-43. Additionally, Dr. Rynkiewicz also recalled that she discussed with Appellant risks to her foot in terms of functionality and lack of improvement. *Id.* at 44. In particular, she discussed "a cavus foot." *Id.*

> First off I know I have a cavus foot because I – I educate. So from a standpoint of they know that the forces are to be outside of the foot, they know that that is a high pressure area that's going to be modified. So we talk about potential weakness, we talk about structures being cut through, bone being cut, repositioned, remodeled so that when she returns to the regular weight bearing forces, the repetitive things that she had corrected hopefully we can reduce the risk of that happening again. Now you can't guarantee it and with cavus feet, sometimes it's a – it's because she continues to walk the way she did in pre-op the forces will return and some of the problems will come back.

*Id.* at 44-45 (sic).

With respect to informed consent, Dr. Rynkiewicz testified that, at the July 1, 2010 appointment, she went through a "Permission for Treatment" form line by line so if there's anything that's going wrong, whether it's a personal situation, a medical situation we can address it[.]" ***Id.*** at 45. The "Permission for Treatment" form provided in relevant part:

> **Dr. Rynkiewicz** may utilize the associates or assistants of her choice and may perform any additional treatment or procedure that she believes is advisable or necessary during the course of the planed treatment.
>
> The above treatment has been explained to me; and I understand it. I understand that there is a recovery time and a remote risk of death or serious disability with any treatment. I understand that the following are some other risks associated with the proposed treatment and that these risks may be a temporary or permanent nature:
>
> **Infection, bleeding/hematoma/clotting/hemorrhaging, scarring/adhesions, lack of improvement or worsening of condition, changes in sensation and/or strength and/or function in the area of the treatment, need for additional treatment, including but not limited to surgery, physical therapy, testing, or application of devices, damage to nerves, tissues or other anatomical structures in the area of the treatment.**
>
> \_\_NRH\_\_ **Patient Initials**
>
>  . . . .
>
> *I agree that it may be presumed that all of my questions and requests for information were answered to my satisfaction if the treatment was rendered, because I understand that I have the right to NOT permit to the treatment.* \_\_NRH\_\_ **Patient Initials**
>
> *I understand that complications often cannot be anticipated; therefore, no guarantee (either express or implied) may be given regarding the results the results of the treatment.* \_\_NRH\_\_ **Patient Initials**

> *I agree to assume the risk associated with the surgery and possible disability associated with this or any surgical procedure.* __NRH__ **Patient Initials**
>
> ***I further understand that this is an important document and acknowledge that I had a sufficient opportunity to review it prior to signing it.***

Permission For Treatment, 7/1/10 (emphasis in original). Dr. Rynkiewicz testified that Appellant signed and initialed the form in all appropriate places. N.T. Trial, Morning Session, 4/17/19, at 48-50. Dr. Rynkiewicz opined that, as a Board Certified Podiatrist who has been practicing for nearly three decades, she provided adequate information to Appellant at the July 1, 2010 appointment to enable her to make an informed decision regarding the surgery. *Id.* at 51.

Moreover, Dr. Rynkiewicz remarked that she did not send the "Permission For Treatment" form to the hospital, even though it documented the nature of the planned surgery and explained the same to Appellant. *Id.* Dr. Rynkiewicz testified that "[t]he hospital has their own form that is a pre-approved form through the hospital board that you just can't add forms to a hospital, they don't like that and – medical records –if it's not an approved form they will pull it." *Id.* at 52. According to Dr. Rynkiewicz, she separately kept blank hospital "informed consent" forms in her office. *Id.* at 53. The reason for doing so, explained Dr. Rynkiewicz, was to inform the hospital that she had discussed the procedure listed with the patient and obtained informed consent. *Id.* Dr. Rynkiewicz testified that, even though she reviewed the hospital's informed consent form with Appellant in her office on July 1, 2010,

she did not ask Appellant to sign it. ***Id.*** at 54. Dr. Rynkiewicz explained that the hospital ***requires*** that one of its employees witness the patient's signature. ***Id.***

After the July 1, 2010 appointment with Dr. Rynkiewicz, Appellant drove directly to the hospital with consent forms provided to her by Dr. Rynkiewicz. N.T. Trial, Afternoon Session, 4/18/19, at 112. At the hospital, Appellant handed the documents to a nurse, who witnessed Appellant's signature on the hospital consent form. ***Id.*** at 113. Appellant acknowledged reading both the "Permission For Treatment" and the hospital consent forms prior to signing them. ***Id.*** at 105, 107, 112-114.

Based on the foregoing evidence, the trial court aptly reasoned:

[Appellant] essentially argues that the weight of the evidence was that the informed consent in this case was delegated by [Dr. Rynkiewicz] to a nurse at the hospital where the surgery was to take place. [Appellant] argues that the "Informed Consent Form" was signed at the hospital with the nurse. [Appellant] ignores the "permission to treat" form that [Dr. Rynkiewicz] uses in the process of informed consent.

. . . .

Here, [Dr. Rynkiewicz] testified to the informed consent process which she reviewed with [Appellant at her appointment] prior to surgery. [Dr. Rynkiewicz] explained that she described the surgical procedure to [Appellant], described alternatives to surgery, described risks of alternatives and described the risks of the procedures to be done. [Dr. Rynkiewicz] testified that she utilized the permission for treatment form and the hospital's informed consent form to keep [Appellant] apprised, going through each [form] line by line. [Dr. Rynkiewicz] testified that she provided adequate informed consent by describing the types of risks and alternatives that a reasonable person would need or want to have in order to make a decision regarding surgery.

- 11 -

[Appellant] initialed and signed the "permission for treatment form" at that [the appointment]. [Dr. Rynkiewicz] also testified that she reviewed the [hospital] "informed consent form" with [Appellant]. [Dr. Rynkiewicz] explained that the hospital where the surgery was to take place requires its own form to be used.

She explained that the hospital requires a "hospital employee to be the person who goes through this form with the patient . . . they want to have their employee witness the signature." Therefore, [Dr. Rynkiewicz] does not have patients sign the hospital's informed consent form in her office. The informed consent form is sent to the hospital with the patient where the patient signs it and a nurse places the patients name and hospital number on it and witnesses the patient's signature.

Trial Court Opinion, 12/18/19, at 6-7 (record citations omitted). Accordingly, we cannot conclude that the trial court abused its discretion in denying Appellant's post-trial motion for a new trial based on the weight of the evidence. There was ample evidence in the record to support the jury's verdict. Dr. Rynkiewicz explained to Appellant the proposed medical procedure and risks involved. The fact that a hospital employee witnessed Appellant's signature on one of the consent forms is of no moment,[3] as Dr. Rynkiewicz reviewed and discussed the necessary consent forms with her prior to surgery. Accordingly, Appellant does not obtain relief.

We now turn to Appellant's second issue that the trial court abused its discretion in qualifying Dr. Jeffrey Boberg as a defense expert on

_____

[3] Appellant cites no authority, and we cannot find any, in support of her proposition that a doctor fails to obtain informed consent where the doctor reviews a consent form with a patient, but the patient signs the same in the presence of a nurse.

Pennsylvania's informed consent doctrine.[4]  As the trial court and Appellees point out, however, Appellant has waived this issue by failing to lodge a timely objection below.  Indeed, she never objected to Dr. Boberg's qualifications as an expert on informed consent during *voir dire* or at any point during trial; the first time Appellant raised this issue was in her post-trial motion.  Our rules of evidence provide that when a litigant challenges the admission of evidence, the issue is preserved if there is "a timely objection, motion to strike or motion *in limine* stating the specific ground of objection."  Pa.R.E. 103(a)(1); **see also** Pa.R.C.P. No. 227.1(b)(1) ("post-trial relief may not be granted unless the grounds therefor . . . if then available, were raised . . . by motion, objection, . . . offer of proof or other appropriate method at trial[.]").[5]  As Appellant did not preserve this issue by making a contemporaneous objection

---

[4] We review challenges to a trial court's qualification of an expert witness under an abuse of discretion standard.  **See Miller v. Brass Rail Tavern, Inc.**, 664 A.2d 525, 528 (Pa. 1995).

[5] A party "may not, at the post-trial motion stage, raise a new theory which was not raised during trial."  **Keffer v. Bob Nolan's Auto Serv., Inc.**, 59 A.3d 621, 630 (Pa. Super. 2012) (citation omitted), **appeal denied**, 69 A.3d 602 (Pa. 2013).  Moreover, explaining waiver in the context of post-trial motions, our Supreme Court remarked: "Rule 227.1, which governs post-trial relief, provides in relevant part that a ground may not serve as the basis for post-trial relief, including a judgment n.o.v., unless it was raised in pre-trial proceedings or at trial."  **Straub v. Cherne Indus.**, 880 A.2d 561, 566 (Pa. 2005).  "The Rule further notes that error that could have been corrected by timely objection in the trial court may not constitute a ground for such a judgment.  Pa.R.C.P. [No.] 227.1(b)(1)."  **Id.**

to Dr. Boberg's qualification as an expert at trial,[6] we find this issue waived on appeal.[7]

Lastly, we address Appellant's claim that the trial court abused its discretion in disallowing her treating physician, Dr. Thomas Jiunta, from testifying on causation. Appellant merits no relief. As the trial court explained:

> [Appellant] did not identify Dr. Juinta as an expert in her Pre-Trial Memorandum filed 11/22/17. [Appellant] did not even list Dr. Juinta as a fact witness in the Pre-trial Memorandum. After objecting to Dr. Juinta's opinion testimony, [Dr. Rynkiewicz] argued that Dr. Juinta had not been offered as an expert and that no expert report had been received during discovery. [Appellant] agreed and the objection was sustained. Thus, he was limited to his observations, diagnoses and any treatment as may be contained in his records. Thereafter, Dr. Juinta continued to provide opinion on causation and [Dr. Rynkiewicz's] objection was once again sustained. [Undeterred,] Dr. Juinta continued thereafter to provide opinion testimony requiring objection. After

---

[6] To the extent Appellant claims that she objected during *voir dire* to Dr. Boberg's qualification as an expert on informed consent doctrine, we disagree. Our review of the transcript reveals that Appellant asked Dr. Boberg whether he was familiar with the standards of informed consent in Pennsylvania and Missouri. N.T. Trial, Afternoon Session, 4/18/19, at 18. Dr. Boberg answered "I would assume they're the same." *Id.* Appellant followed up with "You think they're the same?" Dr. Boberg responded: "Yes I do." *Id.* Thereafter, Appellant asked "What would be that standard?" *Id.* Dr. Rynkiewicz's counsel objected. In response to the objection, Appellant's counsel simply stated: "It's *voir dire*." *Id.* The trial court then sustained the objection, remarking "I'll sustain it for now." *Id.* Appellant neither offered any additional reasons nor did he subsequently object to Dr. Rynkiewicz's request to admit Dr. Boberg as an expert on informed consent, among other things. *Id.* at 16-17, 24.

[7] Appellant's suggestion that she was prevented or not allowed to challenge Dr. Boberg's qualifications during *voir dire* finds no support in the record. As indicated, Appellant neither challenged nor offered any reasons for objecting to Dr. Boberg's qualifications as an expert witness on informed consent.

the last objection, the court requested a side bar. During side bar, Dr. Juinta continued to motion towards the x-rays and was speaking to the jury. While the jury was on recess, Dr. Juinta began laughing when the Court voiced concern over his inability to limit his testimony. After [Appellant] guaranteed that this witness would limit his testimony to facts, he was permitted to continue to testify. And the witness continued to testify.

Even though limited, Dr. Juinta did testify to causation early on in his testimony that [Appellant's] condition was a "result of a surgery that didn't go very well." [Appellant's] expert, Dr. Boc, testified regarding both standard of care and causation. Any further causation testimony would have been cumulative and properly excluded. **See** Pa.R.E. 403 (The court may exclude relevant evidence to avoid "needlessly cumulative evidence."). Finally, even if error occurred by limiting Dr. Juinta's testimony as to causation, any error is harmless because the jury did not reach the question of causation. The jury found that [Dr. Rynkiewicz] not negligent.

Trial Court Opinion, 12/18/19, at 12-13 (record citations omitted). Any error by the trial court was harmless. The jury already had heard from Appellant's expert on the issue of causation and any testimony from Dr. Juinta, who was not identified or disclosed as an expert, would have been merely cumulative. Critically, the jury never reached the issue of causation and damages when it found in favor of Dr. Rynkiewicz on Appellant's negligence claim. **See** Verdict Slip, 4/22/19 ("Do you find that Defendant was negligent in her care, treatment, and surgery of Nicole Heyer?" "NO _✓_"). Accordingly, Appellant is not entitled to relief. **See Lykes v. Yates**, 77 A.3d 27, 33 (Pa. Super. 2013) (in denying the appellant's request for new trial, we concluded that, because the jury did not find the defendant negligent, and therefore "did not

deliberate on causation or damages," and any erroneous evidentiary ruling on causation "did not affect the verdict.").

In sum, the trial court did not abuse its discretion in denying Appellant's weight of the evidence claim. Appellant has waived her challenge to Dr. Boberg's qualification as an expert on informed consent by failing to lodge a timely objection. The trial court's decision to disallow Dr. Juinta from offering testimony on causation constituted harmless error because the jury found Dr. Rynkiewicz not negligent.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/09/2021