842 A.2d 349

**LouAnn COLEMAN, Appellant,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (INDIANA HOSPITAL AND PHICO SERVICES COMPANY),**
**Appellees.**

Supreme Court of Pennsylvania.

Argued Sept. 8, 2003.

Decided Feb. 17, 2004.

40

Vincent J. Quatrini, Jr., Esq., Greensburg, for LouAnn Coleman.

Amber Marie Kenger, Esq., Richard C. Lengler, Esq., Mechanicsburg, for WCAB.

Stephen L. Dugas, Esq., Hollidaysburg, for Indiana Hospital.

Before RALPH J. CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, LAMB, JJ.

## *OPINION*

Justice EAKIN.

The issue before this Court is whether a "physical examination" pursuant to 77 P.S. § 651(a) of the Workers' Compensation Act includes diagnostic testing.[1] In April 1995, claimant

1. Section 651(a) states:

At any time after an injury the employee, if so requested by his employer, must submit himself at some reasonable time and place for a physical examination or expert interview by an appropriate health care provider or other expert, who shall be selected and paid for by the employer. If the employee shall refuse upon the request of the employer, to submit to the examination or expert interview by the health care provider or other expert selected by the employer, a workers' compensation judge assigned by the department may, upon petition of the employer, order the employee to submit to such examination or expert interview at a time and place set by the workers' compensation judge and by the health care provider or other expert selected and paid for by the employer or by a health care provider or other expert designated by the workers' compensation judge and paid for by the employer. The workers' compensation judge may at any time after such first examination or expert interview, upon petition of the employer, order the employee to submit

suffered a lifting injury to her right shoulder while working as a licensed practical nurse. She had two surgeries on her right shoulder in 1995 and 1996. She also voluntarily submitted to an MRI and triphasic bone scan in 1996, with no complications aside from redness, swelling, and bruising at the injection site for 4 to 5 days.[2] Since the injury, claimant has complained of pain in her right shoulder and arm, which worsens with activity. She has received nerve blocks, physical therapy, psychological therapy, drug therapy, and TENS unit, but without relief.

In March 2000, Fred K. Khalouf, D.O., conducted an independent medical evaluation and believed her symptoms to be disproportionate to objective findings. Khalouf Letter, 3/1/00, at 3; R.R., at 4a ("I strongly suspect symptom fabrication."). However, to complete his evaluation, a triphasic bone scan and MRI were requested. Claimant refused to comply with the

himself to such further physical examinations or expert interviews as the workers' compensation judge shall deem reasonable and necessary, at such times and places and by such health care provider or other expert as the workers' compensation judge may designate; and in such case, the employer shall pay the fees and expenses of the examining health care provider or other expert, and the reasonable traveling expenses and loss of wages incurred by the employee in order to submit himself to such examination or expert interview. The refusal or neglect, without reasonable cause or excuse, of the employee to submit to such examination or expert interview ordered by the workers' compensation judge, either before or after an agreement or award, shall deprive him of the right to compensation, under this article, during the continuance of such refusal or neglect, and the period of such neglect or refusal shall be deducted from the period during which compensation would otherwise be payable.
77 P.S. § 651(a).

2. MRI, or magnetic resonance imaging, is a non-invasive procedure that uses powerful magnets and radio waves to construct pictures of the body. See Yale University School of Medicine, *The Patient's Guide to Medical Tests*, at 39 (Barry L. Zaret, MD, senior ed., 1997).

A bone scan is a test performed to identify abnormal processes involving the bone such as tumor, infection, or fracture. A radiotracer (bone-seeking radionuclide) is injected into the bloodstream through a peripheral vein. As it decays, the radiotracer emits gamma radiation, which is detected by a camera that slowly scans the body. The camera captures images used to determine how much of the radiotracer collects in the bones. See Springhouse Corporation, *Illustrated Guide to Diagnostic Tests*, at 695–96 (1994).

requested diagnostic testing, so employer filed a petition to compel her cooperation. Following a hearing, claimant submitted a letter from Robert P. Durning, M.D., stating:

"[P]hysical examination" refers to the detection of physical injury or disease by trained use of the senses to personally look, listen, touch, etc. Use of sense-extenders such as blood pressure cuffs, stethoscopes, ophthalmoscopes, tongue blades, reflex hammers, and so on are part of a physical examination.

In my opinion, imaging studies such as x-ray, ultrasound, CT scan, MRI, and radioisotope scanning are separate and distinct from a physical examination. Those diagnostic or laboratory tests are not part of the physical examination.

Durning Letter, 6/13/00; R.R., at 14a.

The Workers' Compensation Judge (WCJ) found Dr. Khalouf's report, indicating the tests would be "most helpful" in formulating his opinion, to be credible and unrebutted. There was no medical evidence suggesting the tests would not have diagnostic value or place claimant at additional risk. The WCJ recognized that Dr. Durning's definition of "physical examination" may be meaningful in the medical profession; however, the purpose of § 651(a) was to allow the gathering of information to determine the extent of claimant's injury. Consistent with this goal, "physical examination" in the context of the statute included the requested diagnostic tests.[3] Accordingly, employer's petition was granted. Claimant appealed to the Workers' Compensation Appeal Board (WCAB), but by

---

3. The WCJ quoted the pre-amendment version of § 651 in the opinion, and claimant asserts this error requires a remand. The prior version of § 651 simply referred to an "examination." In 1996, the statutory language was amended to read, "physical examination or expert interview." *See* Section 9 of the Act of June 24, 1996, P.L. 350, *amending*, 77 P.S. § 651. The WCJ's action appears inadvertent because his discussion focused on the term "physical examination" in the analysis. The opinion does not suggest the WCJ applied the wrong version of the law; rather, he made a harmless mistake. Claimant also argues adding the "physical" modifier to "examination" demonstrates the General Assembly's intent to restrict employer's access to claimant. We are not persuaded the insertion of "physical" suggests such intent; adding "expert interview" to the spectrum of examination under § 651 suggests employer's access actually enlarged.

the time of oral argument, claimant had already undergone the testing. The WCAB concluded the issue of whether the requested tests were within the physical examination requirements of § 651(a) was moot and dismissed the appeal.

Claimant filed a Petition for Review with the Commonwealth Court, contending the issue fell within an exception of the mootness doctrine because it was capable of repetition and likely to escape judicial review. *See, e.g., Commonwealth v. Joint Bargaining Committee for Pennsylvania Social Services Union,* 484 Pa. 175, 398 A.2d 1001, 1003 (1979). The court agreed, analogizing this matter to *Walker v. WCAB,* 792 A.2d 628, 630 n. 2 (Pa.Cmwlth.2002), where a claimant's attendance of vocational interview pursuant to § 651(a) technically mooted his claim, but this exception to the doctrine applied to allow review of the merits. Here, as in *Walker,* claimant had no choice but to comply to retain her benefits. *See* 77 P.S. § 651(a) (refusal to submit to examination, absent good cause, will suspend benefits).

Regarding the merits, the Commonwealth Court observed that physician examinations have previously been treated as a method of fact finding to assess the extent of a claimant's injuries. *See Coleman v. WCAB,* 808 A.2d 336, 339 (Pa. Cmwlth.2002) (quoting *Maranc v. WCAB,* 156 Pa.Cmwlth. 572, 628 A.2d 522, 524 (Pa.Cmwlth.1993)). Further, the court determined construction of the phrase "physical examination" in § 651(a) as only referring to a physician's physical touch in this context was too restrictive.

As medical science has progressed, diagnostic testing has become a standard tool of the medical profession and has proven to be valuable in the detection of physical injury or disease. . . . Diagnostic testing such as x-rays, MRIs and CT scans have unquestionably aided health care providers in their ability to determine the extent of a claimant's injuries in cases where a mere physical touch would not yield such information. Hence, we conclude that non-invasive diagnostic testing such as an MRI or bone scan falls within the meaning of the term *physical examination* for purposes of [77 P.S. § 651(a) ].

*Id.* (emphasis in original). Accordingly, the WCAB's decision was reversed and the WCJ's order was affirmed.[4]

Claimant questions whether the interpretation of "physical examination" is a question of fact. She contends "physical examination" is a term of art with a singular, accepted meaning in the medical community. Therefore, claimant asserts, employer was required to present medical evidence in support of its position, without which, the WCJ's decision is not supported by the requisite substantial evidence. Claimant further maintains the WCJ substituted his lay impression for Dr. Durning's opinion as a medical expert. This is not the proper analysis. Where a statutory term is without express definition, the definition of that term is a question of law, not of opinion testimony. *See Pettineo v. Philadelphia Law Dept.,* 721 A.2d 65, 67 & n. 4 (Pa.Cmwlth.1998) (collecting cases); *see also Commonwealth v. Gilmour Mfg. Co.,* 573 Pa. 143, 822 A.2d 676, 679 (Pa.2003) (interpretation and construction of statute is question of law).

Claimant argues that rules of construction require this Court to adopt the medical definition of "physical examination." Generally, words and phrases are construed according to their common usage, and technical words and phrases that have acquired peculiar and appropriate meaning are accorded that meaning. *See* 1 Pa.C.S. § 1903(a). Where the General Assembly has not defined a medical term, this Court has looked to dictionary definitions to inform itself. *See, e.g., Morgan v. MacPhail,* 550 Pa. 202, 704 A.2d 617, 619 (Pa.1997) (using Taber's Cyclopedic Medical Dictionary and Black's Law Dictionary to define "operate" and "surgery"). In the medical context, a "physical examination" is defined as an "[e]xamination of the body by auscultation, palpation, percussion, inspection, and olfaction." Taber's Cyclopedic Medical Dictionary, 1584 (19th ed.2001).

4. Contrary to the Commonwealth Court's conclusion, a bone scan involves an invasive aspect when the radiotracer is injected into the patient. *See* note 2, *supra.*

This Court has not singularly embraced strict medical definitions for undefined terms in the context of Workers' Compensation. For example, the term "disability" is not defined under the Act. *See* 1 Torrey and Greenberg, Pennsylvania Workers' Compensation: Law and Practice § 5:3 (2001). In *Unora v. Glen Alden Coal Co.*, 377 Pa. 7, 104 A.2d 104 (Pa.1954), this Court eschewed the premise that disability could be determined exclusively on medical evidence. Instead, disability in the nomenclature of Workers' Compensation imported economic, as well as physical, findings. *Id.*, at 107. In the context of the Act, the term "disability" was synonymous with a loss of earning power. *Id.; see also L.E. Smith Glass Co. v. WCAB*, 571 Pa. 594, 813 A.2d 634, 637 (Pa.2002) (quoting *Unora* ).[5] Similarly, our interpretation of "physical examination" is not restricted to the medical definition.

The purpose of § 651(a) has been aptly summarized by the Commonwealth Court in *Maranc, supra.* In *Maranc*, the claimant refused to attend an ordered medical examination pursuant to § 651(a) because his counsel was not permitted to also attend; claimant argued counsel was necessary since the examination was adversarial in nature. *Id.*, at 524. The court rejected this argument, stating "[t]he Act treats a physician's examination as a method of fact-finding to determine the extent of a claimant's disability for the purposes of determining the right to benefits." *Id.; see also Pancoast v. WCAB*, 734 A.2d 52, 54 (Pa.Cmwlth.1999) ("An independent medical examination, unlike a petition for termination, is a non-adversarial, fact-finding procedure.").[6]

---

**5.** The definitions of disability in the medical and legal communities differ because they serve different purposes. The medical definition is directed towards treatment, while the legal definition focuses on compensability. Mark D. Sullivan and John D. Loeser, *The Diagnosis of Disability: Treating and Rating Disability in a Pain Clinic*, 152 Arch Intern Med 1829, 1832 (1992).

**6.** The physician's examination is a source of information regarding the employee's disability for the referee to consider when the referee makes findings of fact. It is when these facts are presented, and in preparation for the presentation of these facts at deposition and during the hearing, that the adversarial procedure begins. If we were to push the adversarial procedure back to the doctor's office by involving attorneys for both parties in the medical examinations, we would have attorneys

■ Claimant's construction of "physical examination" would limit the evaluation to what a practitioner may observe through the senses, even when enhanced by the mechanical amplification of a stethoscope or sphygmometer. However, employing this rigid clinical definition of "physical examination" would thwart the purpose of § 651(a) by excluding relatively modern diagnostic tools, such as laboratory testing and imaging. The purpose of an examination is to assess the extent and severity of a claimant's injury. Consistent with this purpose, we interpret the term "physical examination" to include all reasonable medical procedures and tests necessary to permit a provider to determine the extent of a claimant's disability. *See also Slingwine v. Industrial Accident Bd.*, 560 A.2d 998, 1000 (Del.1989) (similarly defining "examination" in 19 Del. C. § 2343).

■ However, such a broad definition must be tempered with respect to a claimant's right to be free of unwarranted contact by others. Under the common law, all persons have a right to be free of bodily invasion and to refuse medical treatment. *See In re Fiori*, 543 Pa. 592, 673 A.2d 905, 910 (Pa.1996); *cf. Myers v. Travelers Ins. Co.*, 353 Pa. 523, 46 A.2d 224, 226 (Pa.1946) (examination aided by x-rays and electrocardiograph to recover under disability insurance policy not unlawful invasion of insured's rights); *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) ("No right is held more sacred, or is more carefully guarded, by the common law, than the right of every person to the possession and control of his own person...."). Further, people have a privacy interest in preserving their bodily integrity, which may be afforded constitutional protections. *See, e.g., John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380, 1385–86 (Pa.1990) (discussing use of blood tests to establish paternity); *cf. Camden & Suburban Railway Co. v.*

objecting and interrupting, and the equivalent of a hearing or deposition taking place during a physical examination. This is not the atmosphere in which a fair and reasonable medical examination can take place.

*Wolfe v. WCAB*, 161 Pa.Cmwlth. 361, 636 A.2d 1293, 1296 (Pa.Cmwlth. 1994).

*Stetson,* 177 U.S. 172, 174, 20 S.Ct. 617, 44 L.Ed. 721 (1900) (*Botsford* does not suggest statute authorizing examination would violate United States Constitution). Although the source of claimant's rights and interests is not a matter presently before this Court, these rights and interests nonetheless must be given consideration. A standard must be in place to prevent a claimant from being subjected to an unwarranted, limitless examination.

■ Section 651(a) plainly states the WCJ may order *subsequent* examinations upon petition, but only if deemed "reasonable and necessary." 77 P.S. § 651(a). The absence of such a qualifier for *initial* requests does not operate to allow an employer to subject a claimant to any procedure for the sake of determining the existence or extent of an injury. Instead, the "reasonable and necessary" standard for subsequent examinations must attach to the initial examination as well. What is "reasonable and necessary" is inextricably related to the risk, intrusiveness, and scope of the examination.

The risk associated with traditional techniques of auscultation, palpation, percussion, inspection, and olfaction are almost nonexistent. However, given the wider range of techniques available under the broad definition of "physical examination," the administration of some tests may involve risk to the claimant. In *Muse v. WCAB,* 514 Pa. 1, 522 A.2d 533 (Pa. 1987), this Court considered an aspect of 77 P.S. § 531, which caused a claimant to forfeit compensation if he refused reasonable medical services.[7] Before benefits could be forfeited, the employer had the burden of proving the services involved only a minimal risk and offered a high probability of success. *Id.*

---

7. The portion of the Act at issue in *Muse,* § 306(f)(4) of the Act of December 5, 1974, P.L. 782, *as amended,* 77 P.S. § 531(4), stated:

 If the employe shall refuse reasonable services of duly licensed practitioners of the healing arts, surgical, medical and hospital services, treatment, medicines and supplies, he shall forfeit all rights to compensation for any injury or any increase in his incapacity shown to have resulted from such refusal.

 *Id.* Substantially similar language currently exists at 77 P.S. § 531(8).

We believe a similar risk standard is applicable to physical examinations under § 651(a).

However, employing a risk threshold alone is inadequate to safeguard a claimant's right of self-determination. Some forms of testing may involve a minimal risk, but substantially intrude upon a claimant, yet an unreasonable intrusion upon a claimant is no less violative of her rights than subjecting her to undue risk. This interest against unwarranted intrusions was implicitly recognized in *Mrs. Smith Pie Co. v. WCAB*, 57 Pa.Cmwlth. 274, 426 A.2d 209, 211–12 (Pa.Cmwlth.1981), where the Commonwealth Court affirmed the WCJ's conclusion that a 10–14 day hospitalization for testing, including the intravenous administration of a narco-hypnotic described as horrible and putrid, was unreasonable under § 651. *See also* Pa.R.C.P. 4010 ("Physical and Mental Examination of Persons"), Explanatory Comment (2) (1978) ("Good cause and notice are intended to protect parties against undue invasion of their rights to privacy."); *State Farm Insurance Cos. v. Swantner*, 406 Pa.Super. 235, 594 A.2d 316, (Pa.Super.1991) (describing purpose of good cause requirement for mental or physical examination pursuant to 75 Pa.C.S. § 1796 same as Pa.R.C.P. 4010).

Diagnostic testing extends across a wide spectrum, including non-intrusive procedures like x-rays and considerably more intrusive procedures such as biopsies. At some indefinite point on this intrusiveness continuum, a procedure becomes unreasonably intrusive, regardless of the risk to a claimant. The bone scan requested of claimant, while arguably involving minimal risk based on her experience with the prior scan, required the injection of a radiotracer. This invasive aspect of the bone scan is undeniably an intrusion upon claimant, but the question remains whether the intrusion was reasonable.[8]

8. The level of intrusion is not evaluated solely on whether a test is invasive. *See Mrs. Smith Pie, supra* (excessive hospitalization unreasonable). Moreover, certain tests, while minimally invasive, may still be unreasonably intrusive. *See, e.g.,* John A. Robertson, *Privacy Issues in*

In the purview of a medical examination, the invasiveness of a needle is not unreasonably intrusive; the collection of blood samples is so routinely performed in a physician's office, the event has become almost commonplace. Nor is the introduction of a foreign substance into the body unreasonably intrusive, *per se*. Here, claimant was injected with a substance so an imaging device could provide a more accurate assessment of her condition. However, the result is no more intrusive than if she was required to ingest a contrasting agent before a CAT scan, a noninvasive imaging procedure. *See* Yale University School of Medicine, *The Patient's Guide to Medical Tests*, at 45 (Barry L. Zaret, MD, senior ed.1997). Whether the substance administered is reasonable depends upon the risk analysis. The fact that immunizations and vaccinations are sometimes performed in nonclinical environments, such as the workplace or schools, suggests injections are not unreasonably intrusive.

These standards offer a balance between the goals of accurately assessing claimants' injuries and protecting their right to be free from nonconsensual contact. The standards permit some types of diagnostic testing to occur while limiting the risk exposure and level of intrusion to claimants.[9] In sum,

*Second Stage Genomics*, 40 Jurimetrics J. 59 (1999). This issue, however, is reserved for another day.

9. Claimant suggests the provider should not be permitted to conduct examinations involving any risk because she would have no legal recourse against the provider should something go wrong. *See, e.g., Craddock v. Gross*, 350 Pa.Super. 575, 504 A.2d 1300 (Pa.Super.1986) (physician examining Workers' Compensation claimant on behalf of carrier owed no duty to claimant because of absence of physician-patient relationship). Claimant hypothesizes that if the examining provider failed to determine whether she was allergic to the radiotracer for the bone scan before being injected, and claimant had a reaction, she would have no remedy.

In *Sharpe v. St. Luke's Hospital*, 573 Pa. 90, 821 A.2d 1215 (Pa.2003), an employer contracted with a hospital for the collection of urine samples for employer's drug screening program. An employee provided a sample, which tested positive for drugs. The employee contested the results and sued the hospital alleging it breached its duty of care for collecting specimens. Summary judgment was granted in favor of the hospital, and affirmed by the Superior Court, because no duty extended from the hospital to the employee. *Id.*, at 1218; *see also Ney v. Axelrod,*

diagnostic testing falls under the definition of a "physical examination" in § 651(a) when sought to evaluate the extent of claimant's injuries, provided employer demonstrates the tests are necessary, involve no more than minimal risk, and are not unreasonably intrusive. Here, a remand to consider the risk of the diagnostic tests is not necessary since the matter is technically moot.

Accordingly, the Commonwealth Court's order is affirmed.

Former Justice LAMB did not participate in the decision of this case.

Madame Justice NEWMAN files a dissenting opinion.

Justice NEWMAN, (dissenting).

I must respectfully dissent because I do not believe that diagnostic testing, such as the triphasic bone scan and MRI sought by Indiana Hospital (Employer) in the instant matter, is part of the term "physical examination" pursuant to Section 314(a) of the Workers' Compensation Act,[1] which provides in relevant part as follows:

> At any time after an injury the employe, if so requested by his employer, must submit himself at some reasonable time and place for a **physical examination** or expert interview by an appropriate health care provider or other expert, who shall be selected and paid for by the employer....

77 P.S. § 651(a) (emphasis added). The Workers' Compensation Act does not define "examination" or "physical examination."

723 A.2d 719 (Pa.Super.1999); *Tomko v. Marks*, 412 Pa.Super. 54, 602 A.2d 890 (Pa.Super.1992). This Court rejected a duty analysis restricted merely to whether a conventional physician-patient relationship existed. Under a more thorough analysis utilizing the factors in *Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166 (Pa.2000), the hospital was deemed to owe the employee a duty of reasonable care for collecting the samples. Based on *Sharpe*, it is far from certain that a contracted provider, who subjects a claimant to a test with minimal risk under the rubric of an examination, has no duty to the claimant. This issue, however, is not ripe, and further rumination on the matter would be tantamount to an advisory opinion.

1. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 651(a).

Section 1903(a) of the Statutory Construction Act provides that "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa.C.S. § 1903(a). The majority notes the "medical" definition of "physical examination" as an "[e]xamination of the body by auscultation, palpation, percussion, inspection, and olfaction[,]" but rejects this definition in the workers' compensation context, apparently concluding that medical definitions do not have legal force. *See* Majority Opinion, op. at 44–45, 842 A.2d at 353 (quoting Taber's Cyclopedic Medical Dictionary at 1584 (19th ed.2001)). I cannot agree.

The definition of "examination" is telling. An "examination" is commonly defined as "[a]ny investigation or inspection made for the purpose of diagnosis; usually qualified by the method used." Steadman's Medical Dictionary at 607 (26th ed.1995). *See also* Taber's Cyclopedic Medical Dictionary at 718–719 ("[t]he act or process of inspecting the body and its systems to determine the presence or absence of disease. Terms employed indicate type of examination ...."). Section 1903(b) of the Statutory Construction Act provides that "[g]eneral words shall be construed to take their meanings and be **restricted** by preceding particular words." 1 Pa.C.S. § 1903(b) (emphasis added). Thus, use of the term "physical" in front of the word "examination" in Section 314(a) of the Workers' Compensation Act is meant to limit the scope of the examination.

While not directly on point, in two recent cases, we have noted a distinction between various types of examinations, and specifically that diagnostic testing is not part of a physical examination. *See Davis v. Workers' Compensation Appeal Board (Swarthmore Borough,* 561 Pa.462, 751 A.2d 168, 173 (Pa.2000)) ("Dr. Kadish testified that he had not conducted a **physical** examination, **neurological** examination, or **orthopedic** examination of Davis. Dr. Kadish also stated that he had not requested any **diagnostic studies** to determine whether

there was any pathological condition responsible for the right hand tremors") (emphasis added). *See also Montgomery v. Bazaz–Sehgal,* 568 Pa. 574, 798 A.2d 742, 745 (Pa.2002) ("Sehgal took a history, performed a **complete physical** examination **and** ordered tests") (emphasis added), which indicates that the performance of tests is outside the scope of a "complete physical examination."

However, most compelling in my judgment is the fact that, in 1996, Section 314(a) of the Workers' Compensation Act was amended; prior to 1996 the provision provided in relevant part that:

> At any time after an injury the employe, if so requested by his employer, must submit himself for an **examination,** at some reasonable time and place, to a physician or physicians legally authorized to practice under the laws of such place, who shall be selected and paid by the employer . . . .

77 P.S. 651(a) (West 1995) (subsequently amended). Thus, where the statute currently reads "physical examination," it used to read simply "examination." In order to give the amendment force, without explicit legislative history, we must presume that the legislature intended to limit the scope of an examination sought by the Employer pursuant to Section 314(a).

The majority contends that such a rigid clinical definition will thwart the purpose of a Section 314 "examination," which the majority notes is a "method of fact-finding to determine the extent of a claimants disability for the purposes of determining the right to benefits." Majority Opinion, op. at 45, 842 A.2d at 454 (quoting *Maranc v. Workmen's Compensation Appeal Board (Bienenfeld),* 156 Pa.Cmwlth. 572, 628 A.2d 522, 524 (Pa.1993)). However, *Maranc* was decided prior to the 1996 amendments to Section 314(a). The majority also avers that we are not bound by medical definitions of medical terms, pointing to the fact that "disability" is defined for workers' compensation purposes as "loss of earning power," which imports both economic and physical findings. *See Unora v. Glen Alden Coal. Co.,* 377 Pa. 7, 104 A.2d 104, 107 (Pa.1954).

Steadman's defines "disability" as "any restriction of lack of ability to perform an activity in a manner or within the range considered normal for a human being. The term disability reflects the consequences of impairment in terms of functional performance and activity by the individual...." Steadman's Medical Dictionary at 490. Understanding disability in terms of loss of earning power is entirely consistent with a consequence of impairment of functional performance. This alleged deviation from a purely medical definition of a term does not justify the majority's decision in the present matter to ignore completely the settled understanding of a physical examination, to be conducted by a medical professional, in the unquestionably well-intended pursuit of the spirit of the Workers' Compensation Act.

While I cannot quarrel with the desire of the majority to ascertain more comprehensively the true nature of the injuries suffered by the claimant, and I concede that limiting a Section 314(a) examination to the "laying on of hands" will hinder diagnosis in some cases, our function is not to say what the law should be, but rather to interpret what the law is. As the legislature has acted within the last decade to limit the scope of Section 314(a) by adding the word "physical" to describe the acceptable examination, I cannot sign on to an opinion that would allow an examination that is not fairly characterized as a "physical examination." *See* 1 Pa.C.S. § 1921 ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit").