**PETERS TOWNSHIP SCHOOL DISTRICT, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (ANTHONY), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 8, 2008.

Decided April 2, 2008.

---

David H. Dille and Gregory J. Fischer, Pittsburgh, PA, for petitioner.

Stephanie M. Sewak, Washington, PA, for respondent.

Before McGINLEY, Judge, and FRIEDMAN, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge McGINLEY.

Peters Township School District (Employer) petitions for review from the order of the Workers' Compensation Appeal Board (Board) which affirmed the Workers' Compensation Judge's (WCJ) denial of the Employer's Petition for Physical Examination (Petition) of Scott Anthony (Claimant).

On November 2, 2000, Claimant sustained an injury in the course and scope of his employment which Employer described in the Notice of Compensation Payable (NCP) as a "concussion/[right shoulder] sprain."[1] NCP, January 28, 2000 at 1;

---

1. Claimant was thrown off of a truck and struck his right shoulder and head on the

R.R. at 47. On May 9, 2006, Employer filed a Petition pursuant to Section 314(a) of the Workers' Compensation Act (Act)[2] and requested that Claimant be ordered to submit to a "diagnostic test 72–ambulatory EEG" (diagnostic test) as prescribed by an independent medical examiner, Lawson F. Bernstein, M.D. (Dr. Bernstein). Petition for Physical Examination, May 9, 2006, at 1; R.R. at 43. Claimant answered and admitted he attended the independent medical examination[3] on January 27, 2006, but refused to submit to the diagnostic test upon the advice of his treating physician, Bruce Cotugno, M.D. (Dr. Cotugno). Answer to Petition, May 22, 2006, at 1; R.R. at 45. Dr. Cotugno, board-certified in psychiatry and neurology, was Claimant's treating physician since January 9, 2001.

In support of the Petition, Employer presented the February 14, 2006, May 16, 2006, and June 27, 2006, medical reports of Dr. Bernstein, board-certified in psychiatry, neurology and forensic medicine. In the February 14, 2006, report, Dr. Bernstein recommended Claimant submit to a diagnostic test "to discern whether [Claimant] is having legitimate seizures versus pseudoseizures (or a combination of both)" because of a "high prevalence of pseudoseizures in patients with legitimate seizure disorders." Report of Dr. Bernstein, February 14, 2006, at 4; R.R. at 23.

In the May 16, 2006, report, Dr. Bernstein explained that the "test is important in order to ascertain the frequency and/or severity of the individual's claimed seizure disorder", noting that without the test, he could neither comment on whether Claimant's seizure disorder was truly under control nor whether Claimant was capable of returning to work and/or operating a motor vehicle.[4] Dr. Bernstein stated the diagnostic test involved essentially no risk and was not unreasonably intrusive.[5] Report of Dr. Bernstein, May 16, 2006; R.R. at 27.

In the June 27, 2006, report, Dr. Bernstein indicated that the diagnostic test

---

asphalt. As a result of the injury, Claimant was diagnosed with a clinical seizure disorder after he showed evidence of post-traumatic headaches, concussion with loss of consciousness and short-term memory loss, post-concussive syndrome and an abnormal EEG on December 4, 2000. Claimant developed his first episode of clinical seizure activity around January, 2002. Report of Dr. Cotugno, April 12, 2006, at 1; Reproduced Record (R.R.) at 1.

On December 1, 2004, a Vagus nerve stimulator device was implanted in Claimant's chest due to continued break-through seizures. When Claimant felt a seizure developing he removed a powerful magnet from his belt and swiped it across the implant so that he would receive a jolt that would send an electrical shock to his brain that reduced the number of his seizures. Report of Dr. Cotugno, April 12, 2006, at 2; R.R. at 2; Claimant's Notes of Testimony, June 19, 2005, at 15–16, 26–27; R.R. at 79–80, 90–91.

The parties do not dispute that Claimant's seizure disorder is related to the injuries he sustained on November 2, 2000.

2. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 651(a).

3. Claimant submitted to the "hands-on" part of the independent medical examination.

4. Claimant's driving privileges were suspended because his seizures occurred without warning. Report of Dr. Cotugno, April 12, 2006, at 2; R.R. at 2.

5. Dr. Bernstein explained that the diagnostic test required the subject to wear a cap connected to a device, no larger than an "oversized 'walkman' ", attached by a strap around the subject's neck, which records brain waves/EEG patterns for a period up to 72 hours. Report of Dr. Bernstein, May 16, 2006; R.R. at 27. The test required a 72–hour stay in the hospital. Claimant's Notes of Testimony, June 19, 2005, at 11, 37; R.R. at 75, 101.

would inform him whether the Claimant's current treatment regimen adequately controlled his current seizure disorder. Report of Dr. Bernstein, June 27, 2006; R.R. at 28.

Claimant presented the medical reports of Dr. Cotugno, dated April 12, 2006, and an addendum dated August 1, 2006. In the April 12, 2006, report, Dr. Cotugno opined that a diagnostic test was not necessary and would not be of any "diagnostic yield." He opined that the test would not add anything in regards to Claimant's treatment. Dr. Cotugno indicated that the seizures were unpredictable and unless a seizure was recorded, the test would be of no value.[6] Report of Dr. Cotugno, April 12, 2006, at 2; R.R. at 2.

In the April 12, 2006, report, Dr. Cotugno also opined that he did not believe Claimant suffered from pseudoseizures, rather, all of his events were clinical epileptic convulsions.[7] Report of Dr. Cotugno, April 12, 2006, at 3; R.R. at 3. In the August 1, 2006, addendum Dr. Cotugno agreed that the diagnostic test involved only minimal risk, but opined that it did not have a high probability of success and was not definitive in rendering a diagnosis. Report of Dr. Cotugno, August 1, 2006; R.R. at 5.

Claimant testified that he did not want to undergo the diagnostic test because he didn't "think [the diagnostic test was] going to do anything." Claimant's Notes of Testimony, June 19, 2005, at 41; R.R. at 105. Claimant indicated he underwent testing during an earlier nine-day hospital stay, before the installation of the Vagus nerve stimulator, which corroborated his seizure activity. Claimant questioned the value of the proposed diagnostic test and asked "what's one more test going to do? ... [the seizure activity is] not really a secret." Claimant's Notes of Testimony, June 19, 2005 at 41; R.R. at 105.

The WCJ circulated a Decision and Order on September 14, 2006, and denied Employer's Petition. The WCJ credited Claimant's testimony and was persuaded by Dr. Cotugno's opinion that the diagnostic test was not necessary to assess Claimant's seizure disorder. Dr. Cotugno was found more persuasive than Dr. Bernstein. Decision of the WCJ (WCJ Decision), September 14, 2006, Findings of Fact (F.F.) Nos. 7a–7b at 9; R.R. at 61. The WCJ's decision was based on the accepted evidence which demonstrated that there was no basis "to even suspect potential pseudo seizures", the diagnostic test did not "yield a high probability of success", "the 72–hour EEG testing is of little benefit" unless a seizure occurs, and the Claimant was "being asked to spend three days in a hospital." WCJ Decision, F.F. Nos. 7c–7d at 10; R.R. at 62. Employer appealed to the Board, which affirmed the WCJ's decision.

6. Dr. Cotugno opined that to truly evaluate whether Claimant suffered seizures along with pseudoseizures, a continuous video EEG in an epilepsy monitoring unit would have to be performed until a seizure was recorded, which could take a number of weeks. Report of Dr. Cotugno, April 12, 2006, at 2; R.R. at 2.

7. Dr. Cotugno has treated patients with pseudoseizures and seizures and concluded:

[Claimant] does not give unusual triggers, he has not had events while in the waiting room or in the medical settings. He is not suffering from any significant psychiatric disorder. He has no evidence of florid positive review of symptoms. His ictal activity has never been described as asynchronous, pelvic thrusting associated with weeping or stuttering, opisthotonic posturing, or side to side movements which can be fairly characteristic for pseudoseizure.

Report of Dr. Cotugno, April 12, 2006, at 3; R.R. at 3.

■ Employer contends [8] the WCJ improperly applied the relevant legal standard and relied on incompetent speculative opinion evidence regarding the potential outcome of the diagnostic test when it was determined that the test was neither reasonable nor necessary. Employer also contends that the Board committed an error of law when it affirmed the WCJ's denial of Employer's Petition and deprived Employer of its right to obtain a medical opinion regarding the extent and degree of Claimant's disorder.

Section 314(a) of the Act, 77 P.S. § 651(a), provides as follows:

At any time after an injury, the employe, if so requested by his employer, must submit himself at some reasonable time and place for a physical examination ... by an appropriate health care provider ... who shall be selected and paid for by the employer. If the employe shall refuse upon the request of the employer, to submit to examination ... a workers' compensation judge assigned by the department may, upon petition of the employer, order the employe to submit to such examination.... The workers' compensation judge may at any time after such first examination ... upon petition of the employer, order the employe to submit himself to such further *physical examinations ... as the workers' compensation judge shall deem reasonable and necessary ....*

77 P.S. § 651(a) (emphasis added).

■ A "physical examination" includes all reasonable medical procedures and tests necessary to permit a provider to determine the extent of employee's disability. *Coleman v. Workers' Compensation Appeal Board (Indiana Hosp.)*, 577 Pa. 38, 46, 842 A.2d 349, 354 (2004). As is the case here, where the employer petitions the WCJ to compel an employee to undergo diagnostic testing, it bears the burden to demonstrate the test is "necessary, involve[s] no more than minimal risk and [is] not unreasonably intrusive." [9] *Coleman*, 577 Pa. at 50, 842 A.2d at 356. To determine whether a claimant should be compelled to undergo a diagnostic test, the WCJ must balance the goal of "accurately assessing the claimants' injuries [against the goal of] protecting [his or her] right to be free from nonconsensual contact." *Id.*

■ First, Employer's argues that the WCJ misapplied the relevant legal standard in *Coleman* in considering whether the diagnostic test was necessary.[10] Employer argues that the WCJ erroneously

---

**8.** This Court's scope of review is limited to determining whether the necessary findings of fact are supported by substantial evidence, whether errors of law were made, or whether constitutional rights were violated. *Lincow v. Workers' Compensation Appeal Board (Prudential Securities, Inc.)*, 832 A.2d 569 (Pa. Cmwlth.2003).

**9.** While both parties agree the diagnostic test is of minimal risk, they disagree that it is unreasonably intrusive and necessary. Although the parties agree that the EEG device was not physically invasive, the WCJ determined that the EEG was intrusive to the extent Claimant would have to spend days in a hospital with no guarantee that any significant information would be obtained. WCJ

Decision, F.F. Nos. 7e–7f at 10–11; R.R. at 62–63. This Court will address the necessity of the diagnostic test.

**10.** Employer asserts that the diagnostic test was necessary to determine whether Claimant was experiencing pseudoseizures, the frequency and/or severity of the Claimant's seizures, the efficacy of his current treatment regimen to control his seizure disorder and the extent to which Claimant is capable of returning to work. Employer explains that the purpose of the independent medical evaluation was to gauge the extent the Claimant's condition may have improved since the installation of the Vagus nerve stimulator in December, 2004.

required Employer to prove Claimant actually had pseudoseizures; that Claimant would experience a seizure during the diagnostic test; or the test would provide definitive information regarding Claimant's condition, before Claimant could be compelled to undergo the test. This Court disagrees.

Although the WCJ discussed Employer's failure to present persuasive evidence establishing a basis to suspect pseudoseizures, the WCJ did not require Employer to prove Claimant actually experienced pseudoseizures. To the extent the diagnostic test was an "attempt to rule out pseudoseizures" and there was no persuasive evidence that suggested Claimant experienced such pseudoseizures, the WCJ found the test was not necessary. WCJ Decision, F.F. No. 7c at 10; R.R. at 62. The Board agreed the WCJ applied the relevant law, Coleman, and found the WCJ balanced the likelihood of whether the diagnostic test would yield useful information regarding Claimant's seizure disorder, specifically pseudoseizures, against the Claimant's right to avoid the intrusion of a 72–hour hospital confinement.

■ The WCJ did not impose a requirement that Employer prove Claimant would sustain seizure activity during the diagnostic test. Instead, the WCJ effectively assessed the usefulness of the diagnostic test to evaluate the condition and/or extent of Claimant's seizure disorder to determine whether the test was reasonable and necessary. During the June 19, 2006, hearing, the WCJ specifically asked Employer "what are the chances of getting useful information?" if the Claimant submitted to the diagnostic test. Claimant's Notes of Testimony, June 19, 2005, at 46; R.R. at 110. Employer was unable to offer any evidence on point. In neither Dr. Bernstein's May 16, 2006, report nor the June 27, 2006, report did he discuss the chances

the diagnostic test would yield useful information or indicate the likelihood that he could render a final opinion regarding the current level of Claimant's seizure disorder if Claimant failed to have a seizure during the test and the results were negative. Ultimately, the WCJ accepted and relied on Dr. Cotugno's opinion that the results of the test would be of little to no diagnostic value, or otherwise useful, unless a seizure occurred. WCJ Decision, F.F. No. 7d at 10; R.R. at 62. The WCJ did not err when he found that Employer failed to meet its burden to prove that the diagnostic test was "reasonable and necessary." Section 314(a) of the Act, 77 P.S. § 651(a).

■ Employer also argues that the WCJ erroneously required Employer to prove the diagnostic test would supply definitive information regarding Claimant's condition. Employer contends the WCJ's wrongful application of the standard required Employer to establish the diagnostic test had a high probability of demonstrating some type of positive result, i.e., whether Claimant would experience recordable seizure activity. Employer suggests the diagnostic test might actually be a success if Claimant did not experience a seizure and the test results were negative. Employer asserts that Dr. Bernstein never indicated the test would only be of diagnostic yield if Claimant had a seizure during the test, and moreover, the purpose of the diagnostic test was to study what the test showed, or did not, and to formulate opinions about the extent and condition of Claimant's disability.

Employer essentially stresses that the WCJ failed to recognize the potential diagnostic value of a negative study. However, Employer failed to produce any evidence that established the test might be as beneficial for what it does *not* show or that Dr. Bernstein could render a final opinion based upon negative results. Even if neg-

ative results could theoretically be beneficial and yield useful information regarding Claimant's seizure disorder, this alone does not abrogate Employer's burden to prove the diagnostic test was "reasonable and necessary." Section 314(a) of the Act, 77 P.S. § 651(a).

■ Employer also argues on appeal that the WCJ erroneously relied on the allegedly incompetent, speculative opinion testimony of Dr. Cotugno regarding the potential outcome of the diagnostic test to determine that the test was not reasonable or necessary. This Court disagrees. The WCJ found Dr. Cotugno's opinion was more persuasive and concluded the diagnostic test was unnecessary. The WCJ credited Dr. Cotugno's opinion that Claimant does not experience pseudoseizures and any test would not be of diagnostic yield unless Claimant experienced a seizure during the test. WCJ Decision, F.F. Nos. 7d–7e at 10; R.R. at 62. The WCJ, as the ultimate fact finder in workers' compensation cases, has exclusive province over questions of credibility and evidentiary weight, including a medical witness, in whole or in part. *Greenwich Collieries v. Workmen's Compensation Appeal Board (Buck)*, 664 A.2d 703, 706 (Pa.Cmwlth. 1995).

■ Additionally, Dr. Cotugno based his opinion on his experience as Claimant's treating neurologist since January, 2001, Claimant's history, current complaints and symptoms, physical examination of Claimant and review of diagnostic evidence. Accordingly, the Board did not commit an error of law when it affirmed the WCJ's denial of Employer's Petition[11] when the WCJ applied the relevant legal standard of

law and determined that "[e]mployer failed to prove that it is entitled to an order compelling a physical examination [as prescribed by the independent medical examiner, Dr. Bernstein] since employer failed to prove the 72–hour EEG testing is necessary." WCJ Decision, Conclusion of Law No. 1 at 11; R.R. at 63.

Second, Employer argues that the WCJ's decision to require Claimant to undergo the diagnostic test effectively deprived Employer of its right to obtain a complete independent medical opinion regarding the degree and extent of Claimant's seizure disorder, contrary to Section 314(a) of the Act, because Dr. Bernstein was unable to comment on Claimant's capacity to work without the results of the test. Again, this Court disagrees.

■ Claimant's failure to submit to the diagnostic test did not affect Employer's ability to obtain a medical opinion. Claimant attended a January 27, 2006, medical examination performed by Dr. Bernstein. Dr. Bernstein noted in his February 14, 2006, report that he also reviewed the " . . . voluminous medical records . . .", including past medical history, social and developmental history, physical examination, mental status examination, cognitive testing and review of "repeat EEGs have consistently shown left temporal lobe base spike and wave phenomena." Report of Dr. Bernstein, February 14, 2006, at 1, 3; R.R. at 20, 22. Employer was afforded the right to obtain an independent medical opinion as to the degree and extent of Claimant's disability based on the available medical information and the WCJ did not

---

11. The grant or denial of a petition to compel a physical examination pursuant to Section 314(a) of the Act, 77 P.S. § 651(a), is within the sound discretion of the WCJ, and our court will not interfere with that decision absent an abuse of discretion. *Linton v. Workers' Compensation Appeal Board (Amcast Industrial Corporation)*, 895 A.2d 677 (Pa. Cmwlth.2006).

deprive Employer of its right to obtain a medical opinion.

Accordingly, this Court affirms.

## ORDER

AND NOW, this 2nd day of April, 2008, the order of the Workers' Compensation Appeal Board in the above-captioned matter is hereby affirmed.